UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
SAMUEL SHMARYA HALBERG,
C.H.,

                        Plaintiffs,           **REPORT AND
                                          RECOMMENDATION**

        -against-                          16-CV-6622-MKB-SJB

UNITED BEHAVIORAL HEALTH,
      *doing business as OptumHealth Behavioral Solutions*,

                        Defendant.
-----------------------------------------------------------------X

**BULSARA, United States Magistrate Judge:**

       Plaintiffs Samuel S. Halberg ("Halberg") and his daughter, C.H. (collectively,

"Plaintiffs") filed this action against Defendant United Behavioral Health ("UBH")

pursuant to the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq*.

("ERISA") to recover unpaid benefits for residential mental health treatment provided

to C.H. from 2012 to 2013.[1]  (Compl. dated Nov. 30, 2016, Dkt. No. 1).  Plaintiffs allege

that UBH wrongfully denied coverage for C.H.'s year-and-a-half stay at a residential

treatment program called 3East, operated by McLean Hospital ("McLean") in

Massachusetts.  (*Id*. ¶¶ 1–2).

       Plaintiffs and UBH have cross-moved for summary judgment.  (Pls.' Mot. for

Summ. J. dated May 18, 2018, Dkt. No. 29 ("Pls.' Mot."); Def.'s Mot. for Summ. J. dated

Nov. 12, 2018, Dkt. No. 38 ("Def.'s Mot.")).  On April 9, 2019, the motions were referred

---

[1] Because of the sensitive nature of the medical records in this case, the Court
refers to C.H. by her initials. *See, e.g.*, *United States v. Mermelstein*, 487 F. Supp. 2d
242, 257 n.5 (E.D.N.Y. 2007) ("I refer to the patients by their initials to protect their
privacy."); *Hartsfield, Titus & Donnelly LLC v. Loomis Co.*, No. 08-CV-3329, 2010 WL
596466, at *4 n.3 (D.N.J. Feb. 17, 2010) ("While the names of the benefit recipients are
set forth in the briefing, given the sensitive nature of their claims, the Court shall refer to
each only by his or her initials.").

by the Honorable Margo K. Brodie to the undersigned for a report and recommendation. For the reasons stated below, it is respectfully recommended that UBH's motion be granted and Plaintiffs' motion be denied.

<u>LEGAL STANDARDS</u>

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "In determining whether summary judgment is appropriate, [the Court] must resolve all ambiguities and draw all reasonable inferences against the moving party." *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. "This is true even though the court [is] presented with cross-motions for summary judgment; each movant has the burden of presenting evidence to support its motion that would allow the district court, if appropriate, to direct a verdict in its favor." *Barhold v. Rodriguez*, 863 F.2d 233, 236 (2d Cir. 1988).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion" in one of two ways. Fed. R. Civ. P. 56(c)(1). It may cite to portions of the record "including depositions, documents, electronically stored information, affidavits

or declarations," "admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  Alternatively, it may show that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(B); *see generally Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988).  These principles governing summary judgment are "equally applicable to the present case even though it involves the review of an administrative record."  *E.R. v. UnitedHealthcare Ins. Co.*, 248 F. Supp. 3d 348, 358 (D. Conn. 2017); *see Gibbs ex rel. Estate of Gibbs v. CIGNA Corp.*, 440 F.3d 571, 575 (2d Cir. 2006).

In moving for summary judgment or answering such a motion pursuant to Federal Rule of Civil Procedure 56, litigants in this District are required by the Local Rules to provide a statement setting forth purported undisputed facts or, if controverting any fact, responding to each assertion.  In both instances, the party must support its position by citing to admissible evidence from the record.  Local Rule 56.1(b), (d); *see also* Fed. R. Civ. P. 56(c) (requiring reliance on admissible evidence in the record in supporting or controverting a purported material fact).  "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties."  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001).

Where genuinely disputed, "the Court will consider the sources for the claims made in dueling Rule 56.1 Statements . . . , rather than rely on the Rule 56.1 Statements themselves[.]"  *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 396 (S.D.N.Y. 2015).  In evaluating the sources of claims made in dueling Rule 56.1 statements, the Court cannot—as is true for the summary judgment

3

motion as a whole—weigh evidence or assess the credibility of witnesses. *See United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994). Legal arguments are impermissible in any Rule 56.1 Statement and are to be disregarded. *See Sattar v. U.S. Dep't of Homeland Sec.*, 669 F. App'x 1, 3 (2d Cir. 2016) ("Rule 56.1 statements are statements of fact rather than legal arguments.") (quotations omitted); *Congregation Rabbinical Coll. of Tartikov*, 138 F. Supp. 3d at 394 ("[T]he Court can . . . disregard legal conclusions or unsubstantiated opinions in a Local Rule 56.1 statement.").

In deciding a motion for summary judgment under ERISA for denial of benefits, a court generally looks only to the administrative record created by the insurance company during the evaluation and resolution of an insured's claims for benefits. *Halo v. Yale Health Plan*, 819 F.3d 42, 60 (2d Cir. 2016) ("[W]hen reviewing claim denials, whether under the arbitrary and capricious or *de novo* standards of review, district courts typically limit their review to the administrative record before the plan at the time it denied the claim."); *S.M. v. Oxford Health Plans (N.Y.), Inc.*, 94 F. Supp. 3d 481, 497 (S.D.N.Y. 2015) ("[A] motion for summary judgment provides an appropriate vehicle whereby the Court can apply substantive ERISA law to the administrative record.") (quotations omitted), *aff'd*, 644 F. App'x 81 (2d Cir. 2016); (*see* Excerpts of Administrative R. ("Admin. R."), attached as Ex. A to Decl. of Denise C. Strait ("Strait Decl."), attached as Ex. 1 to Mot. to File Under Seal, Dkt. No. 42).[2] The court may look outside the administrative record for good cause shown. *See Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 631 (2d Cir. 2008) ("[A] district court's decision to admit

---

[2] Citations to the any documents within the administrative record will be based on the Bates-stamped page numbers. The Court omits the "HAL" designation and the leading zeros in its citations to these pages.

evidence outside the administrative record is discretionary, but which discretion ought not to be exercised in the absence of good cause.") (quotations omitted).

FACTS

Unless otherwise noted, based on a review of the parties' Rule 56.1 statements and responses, declarations, pleadings, and the administrative record, the Court has determined the following facts are material, beyond genuine dispute, and supported by admissible evidence.

A.    The Parties

UBH is a California corporation operating under the name "OptumHealth Behavioral Solutions"; it administered the health benefits for C.H.'s group health insurance plan, which was sponsored by her mother's private employer, AXA Equitable Insurance Company (the "AXA Plan").  (Compl. ¶¶ 3, 8; Answer dated Jan 4, 2017, Dkt No. 6, ¶¶ 3, 8).  Samuel Halberg is C.H.'s father and has been appointed by C.H. to act as her ERISA authorized representative; he is also the attorney for Plaintiffs in this action.  (Compl. ¶ 6).  Aetna was the insurance company that administered the AXA Plan before UBH took over.  (*See* Def.'s Suppl. Resps. & Objs., attached as Ex. 7 to Decl. of Samuel S. Halberg ("Halberg Decl. I"), attached as Ex. 3 to Pls.' Mot., Dkt. No. 29, at 3).

B.    C.H.'s Health Care Plan Policy

C.H. is a participant in her mother's health care plan, the AXA plan, which is a group health plan sponsored by AXA, her mother's employer.  (Def.'s Rule 56.1 Stmt. ("Def.'s 56.1 Stmt."), attached as Ex. 3 to Mot. to File Under Seal, Dkt. No. 42, ¶ 1; Pls.' Resp. to Def.'s Rule 56.1 Stmt. ("Pls.' 56.1 Resp."), attached as Ex. 1 to Pls.' Mem. in Opp'n ("Pls.' Opp'n Br."), Dkt. No. 32, ¶ 1).  UBH is responsible for the administration of benefits and also provides C.H. with health insurance coverage.  That is, AXA sponsors

the group health insurance plan, while UBH administers it and makes benefits decisions. (Def.'s 56.1 Stmt. ¶¶ 1–2; Pls.' 56.1 Resp. ¶¶ 1–2). The parties disagree which Summary Plan Description ("SPD") governs the plan.[3]

Plaintiffs contend that the operative document is a 2007 SPD published by a different insurance company, Aetna. (*See* Pls.' Rule 56.1 Stmt. ("Pls.' 56.1 Stmt."), attached as Ex. 2 to Pls.' Mot., Dkt. No. 29, ¶¶ 29–30). This is based on two emails received by C.H.'s mother. These emails came to light when C.H. and her parents attempted to identify the correct SPD that UBH had used in its coverage determinations. In May 2017, Lisa Reed, a senior manager from the human resources benefits administration for AXA, attached the 2007 Aetna SPD to an email sent to C.H.'s mother. (*See* May 25, 2017 Email from Lisa Reed ("Reed Email"), attached as Ex. 6 to Halberg Decl. I, Dkt. No. 29, at 2). In the email, Reed states that the Aetna SPD—"summarizes the terms of the active health plan in effect as of January 1, 2007 and is known as a Summary Plan Description" and that "you should refer to this SPD and the subsequent attached annual enrollment guides from 2007 through 2013 for information about the health plan for" the relevant years. (*Id.*). Aetna, as described above, was the prior administrator of the AXA plan before UBH, and issued its own SPD in connection with its administration of AXA's insurance plan.

The Aetna SPD provides a definition of "medically necessary" in its glossary that states:

---

[3] "Summary plan descriptions . . . are documents provided by insurance companies that describe the benefits available to employees." *D'Iorio v. Winebow, Inc.*, 68 F. Supp. 3d 334, 339 (E.D.N.Y. 2014). "ERISA require[s] that a summary plan description . . . reasonably apprise participants and beneficiaries of their rights and obligations under the plan." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007) (citing 29 U.S.C. §§ 1022(a), 1024(b)).

a service or supply furnished by a particular provider is 'Medically Necessary' if the Claims Administrator determines that it is 'appropriate' for the diagnosis, the care or the treatment of the illness . . . involved.  To be appropriate, the service or supply must . . . be a care or treatment, as likely to produce a significant positive outcome as, and no more likely to produce a negative outcome than, any alternative service or supply, both as to the illness . . . involved and the person's overall health condition.

(Reed Email at 107 (attaching the Aetna Health Plan SPD)).

UBH contends that the Aetna SPD is not the relevant SPD.  Michael Francesconi, AXA's senior director of benefits—who attests that he has personal knowledge of the plans that AXA offered its employees and the documents for those plans—refers to a different SPD than Reed does in her email.  (*See* Decl. of Michael A. Francesconi ("Francesconi Decl."), attached as Ex. 3 to Def.'s Mot, Dkt. No. 38, ¶¶ 1, 5).  Attached to Francesconi's declaration is what he describes as the "AXA Welfare Plan document describing the plan benefits for the group health plan" in which C.H. was enrolled in 2011 through 2013.  (*Id.* ¶ 5; *see* Chapter 2: About UHC Medical Coverage ("UBH SPD"), attached as Ex. B to Francesconi Decl., Dkt. No. 38).[4]  This UBH SPD was allegedly provided to C.H.'s mother on May 31, 2013, according to an email that Francesconi sent C.H.'s mother in November 2017.  (*See* Nov. 1, 2017 Email from Francesconi ("Francesconi Email"), attached as Ex. 8 to Halberg Decl. I, Dkt. No. 29, at 690).  For his part, Halberg contends that the only SPD provided to C.H.'s mother or to any other family member was the Aetna SPD.  (Halberg Decl. I ¶ 15).

The UBH SPD provides that the plan administrator (*i.e.*, AXA) "delegated to [UBH], as a Claims Administrator, the exclusive discretion and authority to determine on the Plan's behalf, whether a treatment, supply or service is a Covered Health

---

[4] UBH is a division of UHC, *i.e.*, United Health Care.  *See Silver Hill Hosp., Inc. v. Rizzo*, No. 97-CV-8207, 1999 WL 447446, at *2 (S.D.N.Y. June 30, 1999).

Service." (UBH SPD at 7352). In other words, the AXA Plan delegates the administration of the group health plan it sponsors to UBH for decisions on coverage. (Def.'s 56.1 Stmt. ¶ 3; Pls.' 56.1 Resp. ¶ 3 (disputing that UBH refers to the correct SPD, but not disputing UBH's reading of the UBH SPD language)). The plan provides benefits for "covered services," but only when the service is medically appropriate. The UBH SPD defines covered health services as "those health services . . . which AXA . . . determines to be . . . provided for the purpose of preventing, diagnosing or treating . . . Mental Illness, . . . or [its] symptoms; consistent with nationally recognized scientific evidence as available, and prevailing medical standards and clinical guidelines . . . ; and not identified [as] Exclusions." (UBH SPD at 7407 (emphasis omitted)). UBH characterizes the plan as "only provid[ing] coverage for medical/mental health services that" fall under standard and nationally-recognized medical guidelines; Plaintiffs do not dispute this reading of the UBH SPD, but "that the quoted document is the governing document for the Plan." (Def.'s 56.1 Stmt. ¶ 4; Pls.' 56.1 Resp. ¶ 4). The plan also provides that after exhausting internal appeals, a patient "may choose to participate in the External Review Program," which "offers an independent review process to review the . . . denial of payment for a service." (*Id.* at 7391–92; *see also* Def.'s 56.1 Stmt. ¶ 58; Pls.' 56.1 Resp. ¶ 58).

    C.    <u>C.H.'s Medical and Treatment History</u>

When C.H. was a teenager, she was diagnosed with several mental health conditions, including major depressive disorder, post-traumatic stress disorder, and borderline personality disorder. (Pls.' 56.1 Stmt. ¶ 4; Def.'s Resp. to Pls.' Rule 56.1 Stmt. ("Def.'s 56.1 Resp."), attached as Ex. 6 to Mot. to File Under Seal, Dkt. No. 42, ¶ 4). C.H. attempted suicide on multiple occasions and engaged in self-harm, such as by cutting

herself.  (Pls.' 56.1 Stmt. ¶ 4; Def.'s 56.1 Resp. ¶ 4).  In September 2011, after a suicide attempt, C.H. was hospitalized at Weill Cornell Medical Center in pediatric intensive care.  (Def.'s 56.1 Stmt. ¶¶ 7–8; Pls.' 56.1 Resp. ¶¶ 7–8).  She was then transferred to "adolescent inpatient psychiatry service," where she stayed until September 26, 2011; UBH approved payment for this stay and care.  (Def.'s 56.1 Stmt. ¶¶ 8–10; Pls.' 56.1 Resp. ¶¶ 8–10).

After her stay at Weill Cornell, C.H. was admitted to McLean's residential treatment program, which Plaintiffs refer to as its "2East" program, and stayed for three months from September 26, 2011 to December 27, 2011.  (Def.'s 56.1 Stmt. ¶ 12; Pls.' 56.1 Resp. ¶¶ 12–13; Pls.' 56.1 Stmt. ¶ 6; Def.'s 56.1 Resp. ¶ 6).  UBH approved coverage for C.H.'s stay at 2East.  (Def.'s 56.1 Stmt. ¶ 13; Pls.' 56.1 Resp. ¶ 13).  During her stay at 2East, C.H. was hospitalized on two occasions due to self-injury and suicidal ideation.  (Pls.' 56.1 Stmt. ¶ 6; Def.'s 56.1 Resp. ¶ 6).

On or around December 27, 2011, C.H. moved to a different residential program within McLean, referred to by the parties as its "3East" program.  (Def.'s 56.1 Stmt. ¶ 14; Pls.' 56.1 Resp. ¶ 14 (citing Pls.' 56.1 Stmt. ¶ 39, which only disputes that the 3East program was out of network)).  C.H. remained at 3East for about a year and a half—from

December 27, 2011 to May 8, 2013.  (Def.'s 56.1 Stmt. ¶ 17; Pls.' 56.1 Resp. ¶ 17).[5]  It is UBH's denial of benefits for C.H.'s 3East stay that is the subject of this litigation.

The parties provide conflicting characterizations of the treatment C.H. received at 3East.  UBH claims that 3East provided "24-hour monitoring, frequent group outings to coffee shops, stores, [and] professional basketball games[,] [and] allow[ed] multi-day passes without any contact with the program."  (Def.'s 56.1 Stmt. ¶ 19).  Plaintiffs deny that 3East provided 24-hour monitoring or that outings were "frequent."  (Pls.' 56.1 Resp. ¶ 19).  It is undisputed that "3East afforded some patients the opportunity to shop, engage in physical activity, and leave for school, volunteering or paid jobs."  (*Id.*).  The parties do agree that C.H. engaged in the following activities while at 3East: participated in group therapy, (Def.'s 56.1 Stmt. ¶ 21; Pls.' 56.1 Resp. ¶ 21); "socialized with her peers at McLean and elsewhere, took phone calls, went on walks, and played games," (Def.'s 56.1 Stmt. ¶ 23; Pls.' 56.1 Resp. ¶ 23); left 3East on day passes to visit her parents beginning in January 2012, (Def.'s 56.1 Stmt. ¶ 24; Pls.' 56.1 Resp. ¶ 24); attended school in September 2012, (Def.'s 56.1 Stmt. ¶ 28; Pls.' 56.1 Resp. ¶ 28); applied for jobs, eventually worked outside of the facility in a part-time job, and later worked as a volunteer with an organization called Boston Cares, (Def.'s 56.1 Stmt. ¶¶ 29–30; Pls.'

---

[5] The parties disagree about whether 3East was an out-of-network facility that was "self-pay," or whether it was an in-network provider.  (*See* Def.'s 56.1 Stmt. ¶ 14; Pls.' 56.1 Resp. ¶ 14 (citing Pls.' 56.1 Stmt. ¶ 39)).  Plaintiffs argue that "UBH's denial letters uniformly identified the 3East facility as a contracted, in-network provider." (Pls.' 56.1 Stmt. ¶ 39).  Although the denial letters Plaintiffs cite refer to 3East as an in-network facility, UBH contends "other evidence in the record demonstrates that this was in error."  (Def.'s 56.1 Resp. ¶ 39).  Regardless of whether 3East was in- or out-of-network, however, UBH's reasons for denying coverage did not depend on the network status of 3East.  Because the Court concludes that UBH's denial of coverage for 3East was not arbitrary and capricious—and since that denial was not based on the fact that 3East was out of network—this dispute is not sufficient for Plaintiffs to survive summary judgment.  *See infra* pp. 33–45.

56.1 Resp. ¶¶ 29–30); "socialized with peers by watching movies and knitting," (Def.'s 56.1 Stmt. ¶ 33; Pls.' 56.1 Resp. ¶ 33); and continued to go out on multi-day passes in October and November of 2012, (Def.'s 56.1 Stmt. ¶¶ 44–45; Pls.' 56.1 Resp. ¶¶ 44–45).

While at 3East, C.H. was "restricted from all sharp objects, [but] would nonetheless steal razor blades to cut herself." (Pls.' 56.1 Stmt. ¶ 13; Def.'s 56.1 Resp. ¶ 13). On more than one occasion, C.H. required stitches or other medical intervention after cutting herself deeply. (Pls.' 56.1 Stmt. ¶ 13; Def.'s 56.1 Resp. ¶ 13). C.H. also absconded from the facility at least twice—requiring the police to be called—in failed efforts to obtain sharp objects with which to cut herself. (Pls.' 56.1 Stmt. ¶ 14; Def.'s 56.1 Resp. ¶ 14).

During her stay at 3East, C.H. was also moved temporarily to a hospital on a number of occasions. The first hospitalization occurred after C.H. ran away from the facility in March 2012; she was placed into inpatient care for two days, which UBH covered. (Def.'s 56.1 Stmt. ¶¶ 34–35; Pls.' 56.1 Resp. ¶¶ 34–35). When she returned to 3East, "she discussed her desire for long-term solutions" and visited her parents four days later on a day pass. (Def.'s 56.1 Stmt. ¶¶ 37–38; Pls.' 56.1 Resp. ¶¶ 37–38). However, C.H. had other inpatient hospitalizations afterward, in August, September, and November of 2012, each of which were covered by UBH. (Def.'s 56.1 Stmt. ¶¶ 36, 47; Pls.' 56.1 Resp. ¶¶ 36, 47). After each of these hospitalizations, C.H. would return to 3East, showed signs of improvement, informed her doctors that she hoped to go out on weekends with her peers and begin attending college, and went out on day passes soon after she returned; while she still suffered from some suicide ideation after her return to 3East, these symptoms were less pronounced than they had been in the past. (Def.'s 56.1 Stmt. ¶¶ 39–45 (indicating that after her August 2012 inpatient stay, C.H's "urges of

self-injur[y] [and] suicide [were] at just above baseline"); Pls.' 56.1 Resp. ¶¶ 39–45).

After the November hospitalization, C.H. had no further inpatient treatments during the

rest of her stay at 3East, which ended in May 2013.  (Def.'s 56.1 Stmt. ¶ 48; Pls.' 56.1

Resp. ¶ 48).  C.H.'s psychiatric notes sometimes reported that "she had a euthymic[6] or

bright affect" and that "she was engaged, with good eye contact, appeared cheerful, was

goal[-]oriented" and that her "insight and cognitive skills [were] intact and her

judgment was fair."  (Def.'s 56.1 Stmt. ¶¶ 22, 27; Pls.' 56.1 Resp. ¶¶ 22, 27).  C.H. also

engaged with her treating physicians with regard to her medication, sometimes asking

them to make adjustments.  (Def.'s 56.1 Stmt. ¶ 25; Pls.' 56.1 Resp. ¶ 25).  Treatment

records toward the end of C.H.'s stay at 3East, from January 2013, indicate that C.H.

told her treating providers that "she was feeling motivated . . . to continue to get better,

and that 'she can visualize the life she wants to have.'"  (Def.'s 56.1 Stmt. ¶ 31; Pls.' 56.1

Resp. ¶ 31).

> D.    Coverage Decisions by UBH and Procedural History

UBH covered C.H.'s stay at 3East from her admission until January 14, 2012.

(Def.'s 56.1 Resp. ¶ 2; Admin. R. at 6257).  UBH denied benefits for the rest of C.H.'s

stay, which Plaintiffs paid for out-of-pocket, a cost of hundreds of thousands of dollars.

(Pls.' 56.1 Stmt. ¶ 3; Def.'s 56.1 Resp. ¶ 3).  C.H. began her stay at 3East on December 27,

2011, (Def.'s 56.1 Stmt. ¶ 17; Pls.' 56.1 Resp. ¶ 17); UBH therefore covered only the first

19 days of her treatment there.

---

[6] Euthymia is defined as "a normal, tranquil mental state or mood," specifically in those with mood disorders.  *See Euthymia*, Merriam-Webster, https://www.merriam-webster.com/medical/euthymia (last visited July 26, 2019).

C.H., through her parents, "sought administrative review of UBH's denial of" her benefits for the period of January 15, 2012 to May 8, 2013.  (Def.'s 56.1 Stmt. ¶ 49; Pls.' 56.1 Resp. ¶ 49).  In those appeals, Plaintiffs submitted a number of letters from C.H.'s physicians to argue that her condition required placement at 3East.  (Pls.' 56.1 Stmt. ¶ 23; Def.'s 56.1 Resp. ¶ 23).  While the parties disagree about whether C.H.'s treating physicians actually recommended that C.H. be moved to 3East, a letter written in March of 2013 by two of her 2East therapists for the appeals process said that "we do feel confident that if [C.H.] had not continued to receive intensive residential treatment[,] she would have attempted suicide again, and would have had a high likelihood of succeeding."  (July 15, 2013 Appeal ("July Appeal"), attached as Ex. 1 to Decl. of Samuel S. Halberg ("Halberg Decl. II"), Dkt. No. 44, at 611; *see also* Pls.' 56.1 Stmt. ¶¶ 8, 16; Def.'s 56.1 Resp. ¶¶ 8, 16).  One of C.H.'s treating physicians at 3East, Dr. Blaise Aguirre, said in a letter written on March 15, 2013 that during C.H.'s time at 3East beginning in December 2011, "[n]o other level of care was specialized enough to deal with her symptoms, and without this treatment, the possibility of a completed suicide was high." (Pls.' 56.1 Stmt. ¶ 16; Def.'s 56.1 Resp. ¶ 16; *see also* July Appeal at 616 (describing C.H.'s symptoms of "suicidal ideation and self-injury" as "unrelenting")).  One of C.H.'s psychiatrists at 2East, Dr. Theodore Murray, opined that C.H. "would [attempt] suicide if she returned home and she, as much as any other patient we have ever seen, had an extraordinarily high risk of completing a suicide."  (Pls.' 56.1 Stmt. ¶ 7; Def.'s 56.1 Resp. ¶ 7; July Appeal at 611–12).  In the same letter, Dr. Murray also suggested that "without continued intensive residential treatment, C.H. 'would have attempted suicide again.'" (Pls.' 56.1 Stmt. ¶ 7; Def.'s 56.1 Resp. ¶ 7; July Appeal at 611).  This letter is dated March

15, 2013.  Dr. Murray wrote the letter at the request of C.H. and her family during the appeals process of UBH's denial of benefits for the stay at 3East.  (July Appeal at 611).

The parties do not identify the timeline of the initial benefit denials and appeals and simply refer to "appeals" and "denials" throughout their papers, making it almost impossible to identify with precision the specific decisions—and rationales—that are at issue.  Plaintiffs do not identify with date and citation the specific decisions by UBH that are being challenged.  (*E.g.*, Pls.' Mem. in Supp. ("Pls.' Supp. Br."), attached as Ex. 1 to Pls.' Mot., Dkt. No. 29, at 6–7 ("UBH's findings not only contradicted C.H.'s medical records and the opinions of her actual treating providers, they also contradicted UBH's own Level of Care Guidelines for Residential Care. . . . UBH's denials also contradicted the definition of 'medically necessary' provided in the SPD for the AXA plan."); Pls.' Reply Mem. ("Pls.' Reply"), Dkt. No. 37, at 4 ("UBH held that the services were not medically necessary merely because they 'could have occurred in a less intensive setting.'") (does not provide source for quotation)).  Nor does UBH provide specific dates or descriptions of its denial letters.  (*E.g.*, Def.'s Mem. in Supp. ("Def.'s Supp. Br."), attached as Ex. 4 to Mot. to File Under Seal, Dkt. No. 42, at 7–8 (citing to "denials of first level appeals" and "denials of second level appeals")).

The Court's own review of the administrative record reveals the following: while it is not clear from the record when the first appeal was filed—and the parties neglect to provide copies of all appeals correspondence in their respective exhibits—the earliest reference the Court can find to an appeal by Halberg is September 13, 2012.  In the case notes UBH made for C.H., a "Contact Summary" states that "[o]n 9/13/2012, UBH rec[eiv]ed an appeal request letter and medical records from Samuel S. Halberg." (Admin. R. at 6168).  Other contact summaries indicate that Halberg made other

appeals that were received by UBH on January 18, 2013, March 4, 2013, April 1, 2013, and April 17, 2013.  (*Id.* at 6256, 6261, 6266, 6269).  The partial record provided by the parties contains a number of letters written by UBH in which a physician reviewer reviews C.H.'s medical records and the SPD, among other documents, and makes a decision on whether C.H. is entitled to benefits.  Because the parties do not argue otherwise, the Court views each of these UBH letters as deciding appeals of C.H.'s denial of benefits, and assumes that Plaintiffs are challenging each of these decisions.  (*See* UBH Letters ("Ex. 4 UBH Letters"), attached as Ex. 4 to Halberg Decl. II, Dkt. No. 44, at 514 (2/15/2013 Letter), 27 (3/22/2013 Letter), 29 (4/26/2013 Letter), 31 (5/14/2013 Letter), 22 (10/30/2013 Letter); UBH Letters ("Ex. 5 UBH Letters"), attached as Ex. 5 to Halberg Decl. II, Dkt. No. 44, at 189 (8/16/2013 Letter), 296 (11/15/2013 Letter), 2 (2/14/2014 Letter)).  These UBH letters found as follows:

- On February 15, 2013, a physician reviewer, Dr. Eugene Kwon, determined that coverage at 3East was not available after January 14, 2012.  (Ex. 4 UBH Letters at 515).  Dr. Kwon based his review on "the Summary Plan Description . . . UBH Coverage Determination Guidelines for Residential Treatment of Major Depressive Disorder, and a review of the medical records."  (*Id.* at 514).  The reasons proffered were that services at 3East "do not appear to be consistent with generally accepted standards of practice based on the applicable guideline.  There was significant improvement and [C.H. was] allowed to go on passes with family . . . without supervision"; because the services at 3East were not consistent with standards of treatment for someone in C.H.'s improved condition, according to Dr. Kwon, such a stay was "not considered covered health services," and that "[c]are could have continued with outpatient providers."  (*Id.* at 515).

- On March 22, 2013 another physician reviewer, Dr. Lee H. Becker, affirmed the denial of coverage for C.H.'s stay at 3East. (*Id.* at 27). Dr. Becker reviewed the same materials Dr. Kwon had in his previous letter, but also reviewed Halberg's benefit request letter. (*Id.*). Dr. Becker reached the same conclusion Dr. Kwon did: "the services [C.H. was] receiving were not consistent with generally accepted standards of medical practice for the noted symptoms at this level of care and were considered inappropriate/inconsistent per UBH Coverage Determination Guideline for Major Depressive Disorder [(the "CDG for MDD")] as evidenced by" various improvements Dr. Becker gleaned from C.H.'s medical records. (Ex. 4 UBH Letters at 27–28).

- Dr. Becker wrote another letter dated April 26, 2013. (*Id.* at 29–30). Dr. Becker reiterated the rationale from his letter the month before, concluding that because of C.H.'s numerous improvements, her "treatment could have occurred in a less intensive setting" and therefore her treatment at 3East was excluded from coverage. (*Id.*).

- Dr. Becker wrote yet another letter soon after on May 14, 2013, which similarly denied coverage. (*Id.* at 31–32). The same rationale Dr. Becker used in his prior letter is the basis for his denial; however, he provides new examples of C.H.'s improvements at 3East as the basis for his decision. (*Id.*).

- The next letter from UBH is from August 16, 2013, written by physician reviewer Dr. Roxane Sanders. (Ex. 5 UBH Letters at 189–91). In her review, Dr. Sanders examined C.H.'s medical records, a July 18, 2013 letter from Plaintiffs requesting an appeal, and "[c]are management records." (*Id.* at 190). In making her decision, Dr. Sanders applied the CDG for MDD prior reviewers had also used and concluded "that the services [C.H. was] receiving were not consistent with generally

accepted standards of medical practice for the noted symptoms at this level of care" due to C.H.'s lack of "significant mood symptoms or thought disturbance requiring 24-hour monitoring." (*Id.*).

- UBH issued another letter denying coverage on October 30, 2013, written by Dr. Becker. (Ex. 4 UBH Letters at 22–23). As in the previous denials, Dr. Becker concluded that, given C.H.'s ability "to work with [her] treatment team on [her] recovery goals," and that she "seemed more like [herself] and [was] able to manage [her] day-to-day tasks [and] not act[ ] on every thought/feeling," the treatment at 3East was inconsistent with medical standards and therefore not a covered service. (*Id.*).

- UBH sent another letter on November 15, 2013 written by Dr. Danesh Alam. (Ex. 5 UBH Letters at 296–98). Dr. Alam reviewed the same materials Dr. Sanders did, "including all aspects of clinical care involved in this treatment episode." (*Id.* at 297). Again the letter denies coverage. The decision to do so is based, in part, on the CDG for MDD and the UBH SPD. (*Id*). Dr. Alam concluded that C.H. was "actively participating in treatment[,] . . . did not appear to have significant mood symptoms or thought disturbance requiring 24-hour monitoring[,] [and] had achieved maximum benefit at the residential level of care and a transition to a less intensive setting appeared appropriate." (*Id.*). Therefore, coverage for 3East was outside of C.H.'s plan. (*Id.* at 297).

- The final letter from UBH is dated February 14, 2014 and was written by Dr. Lambros Chrones. (Ex. 5 UBH Letters at 2–3). This is in response to a letter from Plaintiffs received on January 16, 2014. (*Id.* at 2). Again, the CDG for MDD was relied upon, along with the UBH SPD. (*Id.*). Dr. Chrones also found that C.H. was "not exhibiting any behavioral problems that required this level of structure and monitoring.

Overall, [her] mood appeared stable[,] [and] [t]here was no indication that [she] could not tolerate treatment in a less intensive setting. . . .  The intensity of [her] treatment did not match the intensity of [her] condition, and inconsistent or inappropriate services are not covered according to [her] benefits." (*Id.* at 2–3).

Plaintiffs also sought review from an independent review organization ("IRO") in a letter dated December 17, 2013.  (Def.'s 56.1 Stmt. ¶ 56; Pls.' 56.1 Resp. ¶ 56; *see also* Admin. R. at 288–94).  MCMC is the IRO that reviewed Plaintiffs' requests for coverage. (Def.'s 56.1 Stmt. ¶ 58; Pls.' 56.1 Resp. ¶ 58).[7]  MCMC issued its decision confirming UBH's denial of coverage in a letter dated January 30, 2015.  (*See* MCMC Denial Letter, attached as Ex. 11 to Halberg Decl. II, Dkt. No. 44 at 5791–99).  MCMC reviewed the various health plan documents, including the administrative record and the SPD in making its decision; Plaintiffs, however, dispute that MCMC "was provided with the relevant health plan documents."  (Def.'s 56.1 Stmt. ¶¶ 59–60; Pls.' 56.1 Resp. ¶¶ 59–60).  MCMC also indicated in its letter to Plaintiffs that it reviewed UBH's 2011 Level of Care Guidelines for "Mental Health Conditions: Residential Treatment Center."  (MCMC Denial Letter at 5794-95; *see* July Appeal at 554–57; Def.'s Supp. Br. at 9).

In its decision to uphold UBH's denial of coverage, MCMC concluded that C.H.'s treatment "could have been safely and effectively provided at a lower level of care." (Def.'s 56.1 Stmt. ¶ 61; Pls.' 56.1 Resp. ¶ 61).  It did so because "[t]he patient was cooperative and effectively engaged in treatment"; she "had no complicating general medical or clinical psychiatric features that would necessitate 24-hour monitoring *or structure of residential level services*"; "[s]he had a home and social support from her

---

[7] The parties do not indicate whether "MCMC" is an acronym or is the actual name of the entity.

parents including access to intensive treatment and services in the community"; and "[t]he patient was compliant with her treatment plan, medication[-]adherent, and maintaining safety without active suicidal intent or self-harming behaviors." (Def.'s 56.1 Stmt. ¶ 61 (emphasis added); Pls.' 56.1 Resp. ¶ 61 (disputing that these findings are accurate but admitting these were MCMC's findings)). While it did find that C.H. required some form of treatment for her disorders, MCMC found that the denial of coverage for 3East was appropriate because C.H. did not require treatment at the residential level; such a denial was "consistent with the scientific literature and practice guidelines . . . and is consistent with the Plan's definition of medically necessary care," as stated in the UBH SPD's definition of covered services. (*See* MCMC Denial Letter at 5796 (citing the UBH SPD at pages 48 and 56 for its conclusion that 3East was "not medically necessary"); *see also* Def.'s 56.1 Stmt. ¶ 61; Pls.' 56.1 Resp. ¶ 61).

     E.    <u>The Present Lawsuit</u>

Plaintiffs brought this ERISA action on November 30, 2016 in order to recover the costs of treating C.H. at 3East for the period of time that UBH denied coverage. (*See* Compl.). The Complaint contains two causes of action. The first is a claim for benefits pursuant to § 502(a)(1)(B) of ERISA. (*Id.* ¶¶ 24–27). It alleges that UBH's denials of coverage were arbitrary and capricious and that "UBH's determinations should be reversed, and the Court should duly award the requested benefits to Plaintiffs." (*Id.* ¶ 27). The second count is a claim for full and fair review pursuant to §§ 502(a)(3) and 503(2). (*Id.* ¶¶ 28–35). It alleges that "UBH's reviews of Plaintiffs' claims failed to provide the full and fair review mandated under ERISA. Plaintiffs are thus entitled to injunctive relief compelling a proper full and fair review of their claims." (*Id.* ¶ 35).

On May 18, 2018, Plaintiffs moved for summary judgment.  (*See* Pls.' Supp. Br.).  On November 12, 2018, UBH cross-moved for summary judgment on all of Plaintiffs' claims.  (*See* Def.'s Supp. Br. at 2).  In the alternative, UBH argues that, should the Court not grant its motion for summary judgment, it should stay this proceeding pending resolution of a class action filed in the Northern District of California, *Wit v. United Behavioral Health*, No. 14-CV-2346 (N.D. Cal.).  (*Id.* at 17).[8]

DISCUSSION

I.    Review of UBH's Denial of Coverage

The Court first addresses the initial threshold question of which Summary Plan Description applied to C.H.'s health insurance plan, an issue the parties spend significant time discussing in their briefs, and upon which many of Plaintiffs' arguments depend.  Then, the Court determines whether to apply a *de novo* or arbitrary and capricious standard of review in evaluating the adverse benefit determinations that Plaintiffs challenge.  Finally, the Court applies this standard to UBH's decisions denying coverage for C.H.'s stay at 3East after January 14, 2012.

A.    The Operative SPD

"ERISA . . . impose[s] a requirement that the SPD describe the 'circumstances which may result in disqualification, ineligibility, or denial or loss of benefits.'"

---

[8] Plaintiffs dispute the need for a stay, (Pls.' Opp'n Br. at 11), and the Court declines to stay the motions.  UBH argues that C.H. "falls squarely within" the class certified by the district court, and therefore in that litigation C.H. likely would have her claims reprocessed by UBH, thereby mooting this case.  (Def.'s Supp. Br. at 17–18).  After a bench trial, Magistrate Judge Joseph C. Spero issued findings of fact and conclusions of law.  (*See* Findings of Fact & Conclusions of Law dated Mar. 5, 2019, No. 14-CV-2346 (N.D. Cal.), Dkt. No. 418, ¶¶ 212, 216).  However, Judge Spero has since allowed the parties to file a motion for remedies and a motion to decertify.  (Min. Entry dated Apr. 1, 2019, No. 14-CV-2346 (N.D. Cal.), Dkt. No. 423).  These motions have not been decided.

20

*Klosterman v. W. Gen. Mgmt., Inc.*, 32 F.3d 1119, 1122 (7th Cir. 1994) (quoting 29 U.S.C. § 1022(b)). "[T]he SPD must be 'sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan.'" *Id.* (quoting § 1022(b)).

A principal and threshold dispute between the parties is which document constitutes the operative SPD to govern the benefits due to C.H. Specifically, the parties dispute whether the SPD issued by Aetna or by UBH was operative at the time of C.H.'s treatment. The Aetna SPD contains a definition of "medically necessary," and Plaintiffs contend that this definition requires that C.H.'s treatment at 3East be covered. Plaintiffs argue that the Aetna SPD must control because UBH or AXA never issued a new SPD once it began plan administration over the AXA Plan, that UBH did not even have access to the Aetna SPD when making coverage determination, (Pls.' Supp. Br. at 7–8), and that Plaintiffs never received the UBH SPD. These arguments are all without merit and, as explained below, do not create an issue of material fact that would be a basis to deny UBH summary judgment.

*First*, even if the UBH SPD were not controlling, there is no basis to use the Aetna SPD in an action against UBH. There is no evidence in the record that UBH relied upon or used the Aetna SPD in making any coverage determinations. It is undisputed that Aetna was no longer the plan administrator at the time of C.H.'s request for coverage and that UBH was the plan administrator. Plaintiffs cite no authority—and this Court is aware of none—that permits them to challenge an administrator's benefits denial based on an SPD issued by a prior administrator.

*Second*, Plaintiffs' current position about the Aetna SPD is a new argument, never raised before in the administrative appeals process. "[T]he presumption is that judicial

review is limited to the record in front of the claims administrator unless the district court finds good cause to consider additional evidence." *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 125 (2d Cir. 2003) (quotations omitted). "In reviewing a plan administrator's decision, [a court] may only consider the evidence and arguments that appear in the administrative record." *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1190 (10th Cir. 2007), *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008); *see also Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 381 (10th Cir. 1992) ("If a plan participant fails to bring evidence to the attention of the administrator, the participant cannot complain of the administrator's failure to consider this evidence. . . . In effect, a curtain falls when the fiduciary completes its review, and for purposes of determining if substantial evidence supported the decision, the district court must evaluate the record as it was at the time of the decision."). At no point in their appeals below did Plaintiffs argue either that (1) the Aetna SPD was the operative document; or (2) the UBH SPD cannot be relied upon in evaluating the coverage denial—a point Plaintiffs now concede. (*See* Pls.' Reply to Order dated July 19, 2019 ("Pls.' Reply to Order"), Dkt. No. 46, at 1 ("These issues were not raised during the administrative process because they first arose in the context of this litigation, years after Plaintiffs exhausted their administrative appeals.")). Plaintiffs also make no reference to Aetna or an Aetna SPD in their appeal letters. Indeed, in their appeals, Plaintiffs repeatedly argued that the UBH SPD grants C.H. coverage, not that the UBH SPD should not be considered. (*See, e.g.*, July Appeal at 485–86 (citing the UBH SPD and arguing that this SPD "documents in chapter 2 on page 48 the specific guidelines that are to be utilized when determining medical necessity for mental health[,]" and quoting extensively from UBH SPD at 7399)). The

arguments being made in their summary judgment motion about the Aetna SPD and the inapplicability of the UBH SPD were never made below.  This Court cannot consider such new arguments in determining whether the administrator's coverage denial should be set aside.[9]

Plaintiffs in their response to the Court's Order requesting they identify where in the record they argued that the Aetna SPD controlled, (*see* Order dated July 15, 2019), argue instead that they were not required to exhaust all their arguments below, (Pls.' Reply to Order at 2).  This position is without merit.  As explained, the parties' evidence *and* arguments must have been presented in some fashion in the plan's administrative review process.  Otherwise, the concept of the federal court's review of an administrative determination—which often requires deference be given to that determination—makes little sense.  And even if new arguments could be first presented in litigation—assuming ERISA only requires that a plaintiff exhaust her "claims" and not all theories or issues— the evidence supporting such contentions must appear in the administrative record. Under ERISA, "'an issue or theory that is raised in court proceedings must be based on information or evidence that was actually before the plan administrators.'"  *Novella v. Westchester Cty.*, No. 02-CV-2192, 2004 WL 1752820, at *6 (S.D.N.Y. Aug. 4, 2004) (citing *Bahnaman v. Lucent Techs., Inc.*, 219 F. Supp. 2d 921, 925 (N.D. Ill. 2002)).

The Court's thorough review of the portions of the administrative record provided by the parties indicates that the Aetna SPD was not in the administrative

---

[9] Plaintiffs argue that UBH in its motion papers introduced new arguments about why treatment at 3East would not be covered, including that 3East "offered 'luxury services'" and that it "was [a] 'non-traditional' program."  (Pls.' Reply at 6; Pls.' Opp'n Br. at 7).  These are not arguments or rationales relied upon by UBH in its letters affirming the denial of coverage.  As such, the Court does not rely upon them.

record and was not before the reviewers or administrators who made the adverse benefits determinations at issue in this case.[10]  Indeed, in none of the many briefs filed by Plaintiffs do they cite to a copy of the Aetna SPD that was in the administrative record.

In a similar vein, Plaintiffs argue that the Court must consider the Aetna SPD—and not the UBH SPD—because they only received the Aetna SPD.  Plaintiff Halberg states that, to his knowledge, "the only summary plan description that was ever provided by AXA . . . to any member of my family was the 2007 Aetna Summary Plan Description for AXA's plan." (Halberg Decl. II ¶ 15).  This is a fact not in the administrative record; it is an attempt by Plaintiffs to supplement the factual record and have the Court consider such facts in setting aside the coverage denial.  Even if this Court were to review the coverage denial on a *de novo* basis instead of an arbitrary and capricious standard—an issue dealt with below—there would be no grounds to consider these new extrinsic facts proffered by Halberg.  "[A] court does not consider matters outside the administrative record upon its *de novo* review of an ERISA appeals process; however, the Court may exercise its discretion in admitting additional evidence outside

---

[10] Plaintiff uses emails from Lisa Reed to argue that "AXA identified its 2007 Aetna SPD as the operative summary plan description in effect from 2011 through 2013." (Pls.' 56.1 Stmt. ¶ 27).  UBH counters that Francesconi in his email actually points to the UBH Chapter 2 document as an operative document.  (Def.'s 56.1 Resp. ¶ 27).  Even if this dispute were resolvable on summary judgment, the nature of an ERISA denial of benefits litigation renders them irrelevant.  These emails—and Francesconi's declaration attempting to explain them—were not part of the administrative record below.  The arguments proffered by Plaintiffs about these emails or the UBH SPD were also not part of the record or the decisions below, nor do the parties attempt to show good cause for why the Court should consider them.  The dispute, therefore, is of a piece with the parties' discussion of the Aetna SPD throughout their papers—evidence and arguments not part of the record and that cannot be considered by this Court.

the administrative record upon a showing of 'good cause.'" *Garban v. Cigna Life Ins. Co. of N.Y.*, No. 10-CV-5770, 2011 WL 3586070, at *2 (S.D.N.Y. Aug. 11, 2011) (citing *DeFelice v. Am. Int'l Life Assurance Co. of N.Y.*, 112 F.3d 61, 66 (2d Cir. 1997)). Plaintiffs do not acknowledge that they are offering new evidence on summary judgment, let alone provide good cause.[11]  The Court cannot, therefore, consider those arguments based on material outside the administrative record.  *DeFelice,* 112 F.3d at 66 (noting discretion to consider extra-record evidence "ought not to be exercised in the absence of good cause.").

In any event, the alleged failure to receive the UBH SPD has far less significance than Plaintiffs believe.  In Plaintiffs' view, their failure to receive the UBH SPD deprives the SPD of any force and means that the denial of coverage must be set aside.  This misapprehends the structure of ERISA.  ERISA provides a separate cause of action for failure to provide an SPD in a timely fashion.  *See* 29 U.S.C. §§ 1022(a), 1024(b) ("The administrator shall furnish to each participant, and each beneficiary receiving benefits under the plan, a copy of the summary plan description, and all modifications and changes referred to in section 1022(a) of this title[.]"); *D'Iorio v. Winebow, Inc.*, 920 F. Supp. 2d 313, 318 (E.D.N.Y. 2013) ("Pursuant to ERISA §§ 502(a)(1)(A) and 502(c)(1), a beneficiary may bring a civil action when a plan administrator fails to supply requested

---

[11] Plaintiffs contend that the parties below agreed that the Aetna SPD governed the benefits determination.  (Pls.' Reply to Order at 2).  This is a gross mischaracterization of the record.  The Aetna SPD was not cited to by Plaintiffs to UBH and the Court could not find it in the record before UBH.  And Plaintiffs quoted from and attached the UBH SPD, not the Aetna SPD, in their appeals.  (July Appeal at 486 n.6 (attaching "summary Plan Description, United Healthcare, Chapter 2, Section 6, Exclusions, p. 48").  Plaintiffs admit to having the Aetna SPD as of 2007, (Halberg Decl. I ¶ 15), prior to the administrative process, and could have raised the issue and brought the document to the attention of UBH at the time of their many appeals.  They failed to do so.

plan information."). Plaintiffs are attempting to "use purported ERISA reporting and disclosure violations to create a claim for benefits, typically brought pursuant to Section 502(a)(1)(B). This argument, however, has no place here." *DiSanto v. United Healthcare Ins. Co.*, No. 07-CV-998, 2007 WL 4277502, at *4 (D.N.J. Nov. 30, 2007). That an SPD has not been provided does not automatically render an administrator's decision to deny benefits arbitrary and capricious.

The claimant must offer some evidence from which to infer that the failure to receive the SPD demonstrates that the result reached by the administrator was based on a whim or caprice or was otherwise arbitrary decision-making. *See Tillery v. Hoffman Enclosures, Inc.*, 280 F.3d 1192, 1198 (8th Cir. 2002). In this case, Plaintiffs dispute how the UBH SPD was interpreted and applied, but do not explain why the failure to have a copy prior to the benefits denial undermines the decision reached on administrative appeal. That is, Plaintiffs "fail to offer any analysis explaining how the untimely notice so infected the decision making process as to render the decision to deny suspect." *Id.* at 1199; *see also Campanella v. Mason Tenders' Dist. Council Pension Plan*, 299 F. Supp. 2d 274, 290 (S.D.N.Y. 2004) ("[T]he mere presence of a procedural irregularity is not enough to strip a plan administrator of the deferential standard of review[,] and . . . for a court to apply *de novo* review, a claimant must also present evidence that the irregularity raises serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim.") (quotations omitted), *aff'd*, 132 F. App'x 855 (2d Cir. 2005).

As a result, the Court's inquiry on summary judgment focuses on the UBH SPD, not the Aetna SPD.

B.    Standard of Review

"ERISA § 502(a)(1)(B) permits a plan participant or beneficiary to bring a civil action 'to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.'" *Wilkins v. Mason Tenders Dist. Council Pension Fund*, 445 F.3d 572, 578 (2d Cir. 2006) (quoting 29 U.S.C. § 1132(a)(1)(B)).  "This is the workhorse of ERISA remedy law, the provision under which routine benefit denial and other ERISA claims proceed."  *Id.* (quotations and alterations omitted).

"ERISA does not set out the appropriate standard of review for actions under § 1132(a)(1)(B) challenging benefit eligibility determinations."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989).  However, a "denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Id.* at 115; *see also Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 82 (2d Cir. 2009).  Where "written plan documents confer upon a plan administrator the discretionary authority to determine eligibility," the determination is "not disturb[ed] . . . unless it is arbitrary and capricious."  *Hobson*, 574 F.3d at 82 (quotations omitted); *see also Stern v. Oxford Health Plans, Inc.*, No. 12-CV-2379, 2013 WL 3762898, at *5 (E.D.N.Y. July 17, 2013) ("If the insurer establishes that it has such discretion, the benefits decision is reviewed under the arbitrary and capricious standard.") (quotations omitted).

"Though . . . no one word or phrase must always be used to confer discretionary authority, the administrator's burden to demonstrate insulation from *de novo* review requires either language stating that the award of benefits is within the discretion of the

27

plan administrator or language that is plainly the functional equivalent of such wording." *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 252 (2d Cir. 1999).  The parties do not dispute the grant of discretionary authority to UBH.  The UBH SPD provides that UBH has "the exclusive discretion and authority to determine on the Plan's behalf, whether a treatment, supply or service is a Covered Health Service." (UBH SPD at 7352).  Other courts have held that similar language provides for arbitrary and capricious review.  *See e.g.*, *E.R.*, 248 F. Supp. 3d at 359 n.4 (holding that "We have the sole and exclusive discretion to . . . [i]nterpret Benefits under the Policy," "[i]nterpret the other terms, conditions, limitations and exclusions set out in the Policy," and "[m]ake factual determinations related to the Policy and its Benefits" is an unambiguous grant of discretion to UBH); *Doe v. Blue Cross Blue Shield of Mass., Inc.*, No. 07-CV-4023, 2010 WL 1541567, at *6 (S.D.N.Y. Apr. 12, 2010) ("[T]he Plan unequivocally gives to BCBS 'full discretionary authority to make decisions regarding the amount, form and timing of benefits; to conduct medical necessity review; to apply utilization management; to exercise fair and impartial review of denied claims for services, to resolve any other matter under the benefits plan.'") (quoting from the SPD at issue).

Nonetheless, Plaintiffs believe the Court should review the denial of coverage *de novo*.  Plaintiffs contend that that UBH's failure to comply with ERISA regulations governing claim procedures requires the Court to apply a *de novo* standard.  This Court

concludes that, as a matter of law, there was no underlying regulatory violation, as explained below.[12]

Plaintiffs list four alleged violations of ERISA regulations by UBH: (1) UBH did not reference the definition of "medically necessary" in the Aetna SPD; 2) "UBH failed to take account of the medical records submitted by Plaintiffs demonstrating that C.H. persistently struggled with suicidality [and] self-harm"; (3) "UBH [failed] to provide for an appeal that does not afford deference to the original adverse benefit determination"; and (4) "UBH failed to disclose the identity of the 'expert reviewer' who conducted an external review of C.H.'s claims." (Pls.' Supp. Br. at 9–10). For a panoply of reasons, these alleged regulatory violations are meritless:

1.    The alleged failure to cite to and rely on the Aetna SPD is not a regulatory violation. For one thing, as explained above, the Aetna SPD was issued by a different administrator, and UBH is not required to follow the SPD of a different administrator. For another, Plaintiffs misapprehend the regulation they cite, 29 C.F.R. § 2560.503-1(g)(1)(ii). That regulation requires a plan administrator to "provide a claimant with written or electronic notification of any adverse benefit determination" by "[r]eference to the specific plan provisions on which the determination is based." *Id.* UBH did not deny coverage on the basis of the Aetna SPD, and it was therefore not required to cite to

---

[12] The Court need not, therefore, reach the more difficult question of whether such regulatory violations, if established, would result in *de novo* review. (This is an issue not briefed by the parties, which focuses on whether there was a violation of the regulations). In *Halo v. Yale Health Plan*, 819 F.3d 42 (2d Cir. 2016), the Second Circuit held that a failure to comply with a Department of Labor claims-procedure regulation resulting in a denial of benefits should in fact be reviewed *de novo* "*unless the plan has otherwise established procedures in full conformity with the regulation and can show that its failure to comply with the claims-procedure regulation in the processing of a particular claim was inadvertent and harmless*." *Id.* at 58 (emphasis added).

it.  UBH denied coverage on the basis of its plan documents, which UBH did cite to in its decisions to deny coverage.  (*E.g.*, Ex. 4 UBH Letters at 27, 29, 31, 514; Ex. 5 UBH Letters at 190 (all citing to the "UBH Coverage Determination Guideline" and the AXA SPD)).

2.      Plaintiffs then rely on 29 C.F.R. § 2560.503-1(h)(2)(iv) to argue that UBH failed to take into account particular medical records, including notes from C.H.'s doctors that indicated she had a "high risk of suicide" and other records documenting her suicidal ideation and failure to comply with prior treatment.  The regulation provides for appellate process for adverse benefit determinations and requires the review "take[ ] into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination."  29 C.F.R. § 2560.503-1(h)(2)(iv).  Plaintiffs do not identify in which particular appeals UBH failed to consider C.H.'s medical records.  The blunderbuss approach of referring to "denials," (*e.g.*, Pls.' Supp. Br. at 4–5), does not assist Plaintiffs; it is not the Court's responsibility to sift through a voluminous record to determine which particular denial-of-coverage appeals Plaintiffs believe violated the regulatory requirement.

The records that the Court has been able to identify bely Plaintiff's assertions. The medical records that Plaintiffs point to—letters from C.H.'s physicians—*were* considered in the review process.  The letters themselves are in the portions of the administrative record provided by UBH.  (*See* Admin. R. at 59–60, 62, 64).  They were submitted by Plaintiffs in their appeals.  (*E.g.*, July Appeal at 502–04 (attaching letters as exhibits to the appeal)).  That these letters were not specifically cited to in the appeal denials (or the absence of a reference to a "high risk of suicide" from the letters) does

30

not mean this evidence was ignored.  Plaintiffs do not cite any evidence to suggest that the letters were ignored in the process.  *Stanford v. Cont'l Cas. Co.*, 514 F.3d 354, 360–61 (4th Cir. 2008) ("Stanford has introduced no evidence to support an inference that Continental failed to consider his submitted materials prior to the issuance of its decision.  The fact that Continental was not persuaded by Stanford's submission does not mean that it did not consider it.  Accordingly, Stanford has not shown that Continental violated ERISA's procedures in denying his application for long term disability benefits."), *abrogated on other grounds by Glen*, 554 U.S. at 105.

3.    29 C.F.R. § 2560.503-1(h)(3)(ii) requires ERISA plan beneficiaries be afforded an appeals process that "does not afford deference to the initial adverse benefit determination[s]."  Plaintiffs contend that UBH violated this regulation; again, the argument mischaracterizes the administrative record, and Plaintiffs fail to identify which decisions they challenge (referring only to "appeal responses," in their papers). In various of the appeal decisions, UBH does restate the bases on which coverage was initially denied.  But it does so because the review is evaluating various time periods during C.H.'s overall stay at 3East, not because it is giving deference to those earlier decisions.  (*See* Ex. 4 UBH Letters at 514; 27, 29, 31 (letters dated 2/15/2013, 3/22/2013, 4/26/2013, and 5/14/2013); Ex. 5 UBH Letters at 196 (letter dated 8/16/2013) (identical language Plaintiffs cite in their papers is within a block quotation that is preceded by, "The specific reason for the denial was . . .")).  Nothing in those explanations suggests deference was given, *i.e.*, nothing suggests that the appellate decision was reached because of the decision previously reached or any weight was attached to the prior determination.  To the contrary, in the appeal determinations,

UBH lists the items being relied upon, and the initial denial is *not* one of the items. (*E.g.*, Ex. 5 UBH Letters at 190; Admin. R. at 297).

4.      Plaintiffs' final alleged regulatory violation is based on 29 C.F.R. § 2560.503-1(h)(3)(iv), which they contend requires UBH to disclose the identity of the IRO reviewer who conducted the external review of C.H.'s claims, which Plaintiffs allege UBH failed to do.  The regulation requires that a group health plan's procedures "[p]rovide for the identification of medical or vocational experts whose advice was obtained on behalf of the plan in connection with a claimant's adverse benefit determination, without regard to whether the advice was relied upon in making the benefit determination."  *Id.*  This provision "simply requires" the plan to have a procedure that can provide the identification of these experts upon request, rather than requiring the plan to always provide that information.  *Schuman v. Aetna Life Ins. Co.*, No. 15-CV-1006, 2017 WL 1053853, at *18 (D. Conn. Mar. 20, 2017) ("[M]any district courts have concluded that a plan with procedures that provide for the identification of these experts upon request satisfies the regulation; the regulations do not require explicit disclosure of those experts in the denial letter.") (quotations and alterations omitted).  Plaintiffs have not demonstrated that they "specifically requested

identification of any experts during the pendency of [their] claim and appeal," and there is, therefore, no violation of this regulation by UBH.[13]  *Id.*

Plaintiffs have cited no case where any court has, based on finding any of the identified regulatory violations, chosen to conduct a *de novo* review.  But in any event, as explained above, Plaintiffs have failed to demonstrate the existence of a regulatory violation.  There is, therefore, no basis to review the benefit denials *de novo*, and the Court will instead review them under an arbitrary and capricious standard in light of the discretionary authority provided to a plan administrator in the UBH plan.

### C.    Review under Arbitrary and Capricious Standard

"A decision is arbitrary and capricious only if it is found to be without reason, unsupported by substantial evidence or erroneous as a matter of law."  *Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 486 (2d Cir. 2013) (quotations omitted).  In other words, "[a]n arbitrary and capricious decision is one that does not consider 'the relevant factors,' or involves 'a clear error of judgment.'"  *Wiener v. Health Net of Conn., Inc.*, 311 F. App'x 438, 440 (2d Cir. 2009) (quoting *Jordan v. Ret. Comm. of Rensselaer Polytechnic Inst.*, 46 F.3d 1264, 1271 (2d Cir. 1995)).  Arbitrary and capricious review is necessarily "'narrow,'" and "'[courts] are not free to substitute [their] own judgment for

---

[13] It is not obvious that § 2560.503-1(h)(3)(iv) even applies to the external review conducted by MCMC, an independent organization.  Although no court in this Circuit appears to have addressed the issue, others have found that § 2560.503-1(h)(3)(iv) does not apply to the identity of *external* reviewers.  *See, e.g.*, *Alexandra H. v. Oxford Health Ins., Inc.*, No. 11-CV-23948, 2013 WL 4002883, at *8 (S.D. Fla. Aug. 6, 2013) ("[T]he text of the federal regulation itself suggests that it is not applicable here, as it applies to 'experts whose advice was obtained on behalf of the plan.'  29 C.F.R. § 2560.503-1(h)(3)(iv).  Here, Plaintiff opted to pursue the external appeal.  Thus, although the reviewer's decision upheld Defendant's determination, the external appeal was not obtained on behalf of Defendant."), *rev'd in part on other grounds*, 833 F.3d 1299 (11th Cir. 2016).

that of [the insurer] as if [they] were considering the issue of eligibility anew.'" *Hobson*, 574 F.3d at 83–84 (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995)). "This deferential review applies to both plan interpretation and factual determinations." *Meidl v. Aetna, Inc.*, 346 F. Supp. 3d 223, 233 (D. Conn. 2018) (quotations and alterations omitted).

When courts find that an adverse benefits decision was arbitrary and capricious, they generally do so for one of two reasons. The first is what can be deemed evidentiary failures, such as drawing assumptions not based on substantial evidence, *e.g.*, *Wiener v. Health Net of Conn., Inc.*, No. 04-CV-1300, 2007 WL 2815199, at *4 (D. Conn. Sept. 26, 2007), *aff'd in part, vacated in part on other grounds*, 311 F. App'x 438 (2d Cir. 2009), or ignoring material evidence, *e.g.*, *Benjamin v. Oxford Health Ins., Inc.*, No. 16-CV-408, 2018 WL 3489588, at *8 (D. Conn. July 19, 2018) ("Defendant's failure to consider Plaintiff's medical records . . . amounts to a clear error of judgment, and was therefore arbitrary and capricious.") (quotations and citations omitted). Second are procedural failures or irregularities, such as failure to apply a plan's own standards, *e.g.*, *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir. 2008) ("[W]here the administrator imposes a standard not required by the plan's provisions, or interprets the plan in a manner inconsistent with its plain words, its actions may well be found to be arbitrary and capricious.") (quotations omitted), or to interpret a plan in a manner to render certain plan provisions superfluous, *see Miles v. N.Y. State Teamsters Conference Pension & Ret. Fund Emp. Pension Benefit Plan*, 698 F.2d 593, 599 (2d Cir. 1983).

Plaintiffs, having rested their motion largely on the assumption that review of UBH's decisions should be done *de novo*, do little to explain why the alleged errors they

identify require reversal of the benefit denials under the more deferential arbitrary and capricious standard.  UBH, for its part, takes seemingly contradictory positions.  In opposition to Plaintiffs' motion, they argue that there is a material factual dispute as to what standard of review should apply and factual disputes about whether C.H. was entitled to benefits under the plan.  (Def.'s Mem. in Opp'n ("Def.'s Opp'n Br."), attached as Ex. 5 to Mot. to File Under Seal, Dkt. No. 42, at 2–7 ("At a Minimum There are Genuine Fact Disputes over the Proper Standard of Review."); *id.* at 7–11 ("At Minimum There are Factual Disputes About Whether C.H. was Entitled to Benefits under the Plan.")).  Yet, at the same time, in support of its motion for summary judgment, UBH contends that there are no material issues in dispute as to whether arbitrary and capricious review is appropriate or whether UBH's decisions should be affirmed under such a standard.  (Def.'s Supp. Br. at 10–11).  Sifting through this less than pellucid presentation, this Court has reviewed Plaintiffs' arguments to determine whether there are either evidentiary failings or procedural errors that would render UBH's decisions arbitrary and capricious.  As detailed below, the Court concludes that there are no such deficiencies.  And as such, UBH is entitled to summary judgment on the denial of benefits cause of action.

### 1.  UBH's Consideration of the Evidence

Plaintiffs spend much energy in their papers identifying evidence in the administrative record that is in tension with UBH's (and the independent reviewer's) determination to deny coverage.  For example, Plaintiffs argue that "UBH's determination that the care C.H. received at 3East was 'not medically necessary' is contradicted by C.H.'s medical records [and] the medical opinions of her treating providers," (Pls.' Supp. Br. at 9), and that:

> UBH's determination was clearly erroneous in light of the extensive evidence that C.H. required the structure of residential care in order to progress in her treatment and avoid additional attempts to take her own life. In the face of evidence that C.H. was persistently threatening suicide, engaging in self-harm, running away from her program, and refusing medication and other treatment, UBH blithely contended that she was free of significant mood disorders and could be safely managed in an outpatient setting.

(Id. at 10).

To be sure, Plaintiffs have cited to record evidence that is in tension with these conclusions and suggest a different result could have been reached by the UBH administrators. But that is not sufficient for Plaintiffs to prevail. "[I]f the administrator has cited substantial evidence in support of its conclusion, the mere fact of conflicting evidence does not render the administrator's conclusion arbitrary and capricious." *Elizabeth W. v. Empire HealthChoice Assurance, Inc.*, 709 F. App'x 724, 727 (2d Cir. 2017) (quotations omitted). In this context, "[s]ubstantial evidence . . . is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker and requires more than a scintilla but less than a preponderance." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995) (quotations and alterations omitted). "In short, the question is not whether the record would have permitted a plan administrator to find otherwise, but whether the record compelled the different conclusion urged by [plaintiff]." *Kruk v. Metro. Life Ins. Co.*, 567 F. App'x 17, 20 (2d Cir. 2014).

On the bases of these records and evidence UBH repeatedly concluded that C.H.'s stay at 3East was not necessary or appropriate under the governing care guidelines and she could be treated effectively at a lower level of care:

- "The services that you received [at 3East] do not appear to be consistent with generally accepted standards of practice based upon the applicable guideline. There was significant improvement and you were allowed to go on passes with family and runs without supervision.  At times, your attending physician did not examine you for weeks which would indicate you were much improved. . . .  Care could have continued with outpatient providers, which is a covered benefit and is available locally." (Ex. 4 UBH Letters at 515 (2/15/13 Letter) (indicating decision based on the "a review of the behavioral health services that you received, the review of the Summary Plan Description for Axa Equitable, review of UBH Coverage Determination Guidelines for Residential Treatment of Major Depressive Disorder, and a review of the medical records")).

- "I have determined that the services you were receiving were not consistent with generally accepted standards of medical practice for the noted symptoms at this level of care. . . .  [Y]ou were able to work well with your treatment team on your recovery goals and seemed more like yourself and interacting positively with others.  You did not appear to have serious mood problems that couldn't be managed in a less intensive setting.  You did not have additional medical or substance usage issues requiring 24-hour monitoring and nursing care. . . .  [T]reatment could have occurred in a less intensive setting[.]"  (*Id.* at 27–28 (3/22/13 Letter) (indicating decision based on "review of your Summary Plan Description, review of UBH Coverage Determination Guideline for Major Depressive Disorder and Dysthymic Disorder, and benefit request letter and medical records")).

- "[Y]ou were able to work with your treatment team on your recovery goals; you were more positive in relationships with others.  You did not appear to have

significant mood symptoms or thought disturbance requiring 24-hour monitoring and nursing care. You were able to attend multiple activities and passes. You were able to manage your daily activities and make decisions about treatment. It appears that you had achieved maximum benefit from the residential setting and that you no longer required 24-hour monitoring and treatment." (Ex. 5 UBH Letters at 190 (8/16/13 Letter) (indicating review of "Medical Record(s)," "[t]he letter requesting an appeal," and "[c]are management records").

- "[Y]ou were able to work with your treatment team on your recovery goals by attending programming and taking your medications. You seemed more like yourself and were able to manage your day-to-day tasks. You were not acting on every thought/feeling. You were able to attend multiple activities outside the facility as well as multiple day passes." (Ex. 4 UBH Letters at 22 (10/30/2013 Letter) (indicating review of facility medical records, the SPD, and the UBH Coverage Determination Guideline for Major Depressive Disorder)).

- "[Y]ou were actively participating in treatment. There was no evidence of an imminent risk of harm to self or others. . . . You were generally able to attend all facility activities and passes. It appeared that you had achieved maximum benefit at the residential level of care." (Ex. 5 UBH Letters at 297 (11/15/2013 Letter) (indicating review of "Medical Record(s)," "[t]he letter requesting an appeal," and "[c]are management records")).

- "The record shows you were not exhibiting any behavioral problems that required this level of structure and monitoring. Overall, your mood appeared stable. You were not engaging in any self-harm behaviors during this period. You were generally attending groups and taking your medication. There was no indication that

you could not tolerate treatment in a less intensive setting.  You were able to adequately handle off-unit activities including overnight passes.  You did not have any complicating medical or substance use problem that would not allow treatment at a lower level of care.  The intensity of your treatment did not match the intensity of your condition[.]" (*Id.* at 2 (2/14/2014 Letter) (indicating review of "medical records, case records and a letter of appeal")).

These decisions are within the discretion of the UBH administrators.  UBH's guidelines for coverage state that the plan does not cover mental health services that "in the reasonable judgment of the Mental Health . . . Administrator are" "not clinically appropriate for the patient's Mental Illness . . . based on generally accepted standards of medical practice and benchmarks" or "not consistent with generally accepted standards of medical practice for the treatment of such conditions."  (UBH SPD at 7399).  Such an exclusion applies "even if [the services] are recommended or prescribed by a provider or are the only available treatment for your condition."  (*Id.* at 7397).[14]

These are also, with little doubt, conclusions supported by substantial evidence. The record contains evidence that while C.H. was at 3East (while paying for her stay), C.H.'s suicidal symptoms were less pronounced, (Admin. R. 5874 (risk assessment indicates suicidal ideation was intermittent with no specific plans)); that her mood showed positive and bright affect, (*id.* at 1066, 6293 (case summary) ("The member often reported having a positive mood.  The member was socializing and had bright affect reported in multiple notes.")); and that she was positively engaged with her

---

[14] As the foregoing demonstrates, UBH's decisions were not based upon a plan definition of "medically necessary."  Plaintiffs refer to "medically necessary" in their papers because that is the standard in the Aetna SPD; it is not, however, in the UBH SPD.

caregivers, motivated, and focused on her treatment plan, (*id.* at 49, 84).  Other records indicated that C.H. showed significant improvement in mood and symptoms and she developed the ability to leave the facility on day passes for multiple days at a time throughout her stay.  (*See supra* p. 10; *e.g.*, Admin. R. at 50 ("[Patient] . . . socialized with staff and peers. . . .  [Patient] appeared in euthymic affect throughout dinner."); *id.* at 74 ("[Patient] appeared euthymic in her interactions with staff and residents") (describing C.H. as "Active/Involved" in her group therapy session); Def.'s 56.1 Stmt. ¶¶ 37–38; Pls.' 56.1 Resp. ¶¶ 37–38).

While there is evidence Plaintiffs can point to that supports their position, that does not mean that UBH acted in an arbitrary and capricious manner, and UBS's ultimate conclusion to deny coverage is certainly supported by more than a scintilla of evidence in the record.[15]

This case is similar to the Court's resolution in *E.R. v. UnitedHealthcare Insurance Co.*, 248 F. Supp. 3d 348 (D. Conn. 2017).  In *E.R.*, the Court affirmed UBH's denial of coverage for inpatient treatment for the Plaintiff's eating disorder, and the Court rejected plaintiff's view that residential care was "medically necessary," notwithstanding evidence that "Plaintiff had continued to over[-]exercise, had a complicated family medical history and life at home, struggled to comply with her meal plan requirements at times, was not fully motivated to recover, required structure and

---

[15] Plaintiffs rely heavily on the opinions of C.H.'s treating physicians that she required care at the residential level.  These opinions are not dispositive.  The SPD itself indicates that exclusions are applicable to an insured's health benefits "even if [the services] are recommended or prescribed by a provider."  (UBH SPD at 7397).  "ERISA does not require a Plan Administrator to defer to the conclusions of a treating physician."  *Ramsteck v. Aetna Life Ins. Co.*, No. 08-CV-12, 2009 WL 1796999, at *11 n.7 (E.D.N.Y. June 24, 2009) (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833–34 (2003)).

monitoring, and suffered from bradycardia and othorstatic hypotension around the time of, or within a few weeks prior to, UBH's decision." 248 F. Supp. 3d. at 367. The Court affirmed the benefits denial because the administrative record contained evidence that supported a reviewer's conclusion that the Plaintiff: "(1) was not a risk of harm to herself or other[s], (2) had no medical issues, (3) had reached an appropriate weight, (4) was participating in her recovery, (4) tolerated several out-of-state passes, (5) did not need 24-hour supervision, and (6) could have been safely treated at a less restrictive level of care such as partial hospitalization." *Id.* at 366; *see also Stemme v. Blue Cross Blue Shield of Kan. City*, No. 11-CV-2635, 2013 WL 12362335, at *7 (N.D. Tex. Feb. 25, 2013) (granting summary judgment when "evidence demonstrates that the individuals who reviewed BCBS's initial decision to deny Stemme's claim considered Stemme's evidence but concluded that the opposing evidence was more persuasive."). As in these cases, while there is evidence C.H. had suicidal ideation at times and medical records showed a worsening mood, there is a multitude of evidence, relied upon by UBH, that suggests that C.H. had made significant progress, had improved mood, was not suicidal, and due to those improvements did not need to be in a full-time residential facility for a 16-month period. And when she was in need of a stepped-up level of care, she was hospitalized and provided care at 2East, which was covered by UBH. Although one could draw a different conclusion based upon medical records, that is certainly not sufficient for a reviewing court to conclude that UBH was acting outside of its considerable discretion in denying coverage. And "[e]ven if the evidence supporting [Plaintiffs'] position were more convincing than the evidence supporting [UBH's], there is nonetheless more than a scintilla of evidence supporting [UBH's] conclusion, and a reasonable mind might accept that evidence as adequate to support that conclusion.

There is thus substantial evidence supporting [UBH's] position." *Stemme*, 2013 WL 12362335, at *7.

2.   <u>UBH's Interpretation and Application of the Plan and SPD</u>

Plaintiffs' arguments regarding UBH's interpretation and application of its own plan documents have two components.  First, Plaintiffs argue that UBH's determination is in tension with UBH's own criteria for inpatient residential care.  (Pls.' Supp. Br. at 6).  Second, they contend that UBH did not have access to the correct SPD (referring to the 2007 Aetna SPD) and therefore failed to use the correct definition of "medically necessary" as specified in that document.  (*Id.* at 1–2).

The first argument has no merit.  It is based on the meritless assumption that UBH reviewers were required to rely upon the 2011 UBH Level of Care Guidelines for Mental Health Conditions[:] Residential Treatment Center in making coverage about C.H.'s residential care.  (*See* July Appeal at 554).  The document contains sets of criteria that indicate whether a patient should be eligible for residential treatment for mental health disorders.  (*Id.* at 555–56).  UBH's reviewers did not consider the Level of Care Guidelines document in their respective decisions to deny coverage.  However, Plaintiffs fail to identify in any of their papers any rule, regulation, UBH SPD provision, or any plan provision that requires reviewers to consider the document.  *See, e.g.*, *Summersgill v. E.I. Dupont De Nemours & Co.*, No. 13-CV-10279, 2016 WL 94247, at *9 (D. Mass. Jan. 6, 2016) ("Summersgill, while disagreeing with the use of the Milliman Care Guidelines, does not point to any language in the Plan suggesting that DuPont must apply Christian Science care guidelines in making a coverage determination.") (granting summary judgment for defendants).

42

UBH made its decisions based upon its Coverage Determination Guidelines for Major Depressive Disorder (the "CDG for MDD").  Again, Plaintiffs provide no explanation of why it was inconsistent with the plan for UBH to make its adverse benefits determination based on the CDG for MDD to the ignorance of the Level of Care Guidelines for residential treatment.  The argument in Plaintiffs' appeals to UBH was that UBH's treatment philosophy (which Plaintiffs found on UBH's website) requires that the Level of Care Guidelines be the only set of guidelines used by UBH.  (*E.g.*, Admin. R. at 8 (1/14/14 Appeal)).  However, the language Plaintiffs cite does not privilege the Level of Care Guidelines over the Coverage Determination Guidelines.  In fact, they suggest the opposite.  The UBH treatment philosophy on which Plaintiff relies note that coverage determination guidelines—like the CDG for MDD—are "intended to standardize the interpretation and application of terms of the Member's Benefit Plan including terms of coverage, Benefit Plan exclusions and limitations." (*Id.*).  The level of care guidelines are only "intended to promote optimal clinical outcomes and consistency in the authorization of benefits by . . . Peer Reviewers." (*Id.*).  Nothing suggests that they should be privileged over the coverage determination guidelines, *i.e.*, the CDG of MDD.

Plaintiffs also argue that, regardless of whether UBH used the Level of Care Guidelines document, UBH's denials were inconsistent with the Level of Care Guidelines for residential treatment.  (Pls.' Supp. Br. at 6).  Some of UBH's letters say that C.H. did not appear to require "24-hour monitoring and nursing care," and therefore was ineligible for full-time residential treatment at a facility like 3East.  (*See id.*).  Plaintiffs argue that such a conclusion is at odds with the standard in the Level of Care Guidelines, which provide that residential services are appropriate for "members

43

who *do not* require 24-hour nursing care and monitoring offered in an acute inpatient setting but who do require 24-hour structure." (*Id.*). This inconsistency does not render UBH's decisions arbitrary and capricious.

If UBH's determination was based solely on an incorrect definition of "residential care," then perhaps it is plausible to argue that applying one definition over another was arbitrary and capricious. But here, each denial letter cited a panoply of reasons why C.H.'s treatment was not covered and provided a holistic review of her treatment history and medical records. Given the existence of other rationales in the appeal denial letters that are not based on the Level of Care Guidelines' definition of residential care, it cannot be said that UBH's decision was arbitrary and capricious, even if it misunderstood how the need for "24-hour monitoring" affected the eligibility for residential treatment. *See, e.g.*, *Becker v. Chrysler LLC, Health Care Benefit Plan*, No. 09-CV-344, 2011 WL 2601254, at *6 (E.D. Wis. June 30, 2011) ("Milliman's Care Guidelines did not control Humana's decision but rather were but one of many factors in the decision process. In light of the totality of the circumstances—Jeranek's health condition, the medical records, her prognosis, her life expectancy, and review of her care by independent physicians—Humana reasonably concluded that the care she received was custodial in nature. This Court cannot determine that Humana's decision was arbitrary and capricious simply because Milliman's Care Guidelines was considered in the analysis."), *aff'd*, 691 F.3d 879 (7th Cir. 2012).

Therefore, the Court has no basis to conclude that application of the CDG for MDD and not the Level of Care Guidelines was arbitrary and capricious.

As to the second alleged procedural error, Plaintiffs' argument is again without merit. Plaintiffs contend that UBH should have applied the Aetna SPD. (*E.g.*, Pls.'

Supp. Br. at 7–8; Pls.' Reply at 2–4).  UBH is not Aetna, was not required to use its SPD, and could have chosen to use its own, which UBH did.  Plaintiffs also argue that UBH conceded that it did not possess "the correct" SPD when it denied coverage, and therefore could not have reasonably based a decision on such a document.  By "correct" SPD, Plaintiffs are referring to the Aetna SPD.  That UBH did not have the Aetna SPD is of no moment, because UBH did not base the denials of coverage on the Aetna SPD but its own SPD.  In this same vein, Plaintiffs also argue that the UBH SPD did not contain a definition of "medically necessary" and therefore UBH could not have made decisions about, and denied coverage, based on the absence of medical necessity.  (Pls.' Supp. Br. at 7).  But UBH's denial letters did not use the term "medically necessary" or "medical necessity," or rely on a concept of medical necessity.  UBH instead referred to the non-covered services as "excluded."  (*E.g.*, Ex. 4 UBH Letters at 28 (3/22/13 Letter) (referring to the services as "excluded" per AXA's "Summary Plan Description")).  Such a decision is consistent with the UBH SPD, which has a definition for "Covered Health Services" in its glossary and provides for mental health care exclusions.  (UBH SPD at 7399 (defining exclusions under mental health services), 7407 (glossary definition of "Covered Health Services")).

### 3.  Plaintiffs' Pretext Arguments Have No Merit

Plaintiffs argue that UBH simply used medical necessity as a pretext for denying a service that UBH considered unavailable for reimbursement.  (*See* Pls.' Supp. Br. at 8–9 (The "clinical rationales UBH offered for denying coverage to C.H. were a charade.  The record now reveals that UBH considers 3East a 'self-pay program' that is never eligible for insurance reimbursement. . . .  UBH's purported clinical bases for denying coverage to C.H. were just window dressing to cover the fact that UBH would have

denied coverage regardless of whether the treatment provided to C.H. at 3East was medically necessary in light of her particular condition and circumstances.")).  This argument does not have any merit.

*First*, the record contradicts the claim that UBH would never cover 3East.  The parties agree that C.H. stayed at the 3East program from December 27, 2011 to May 8, 2013, (Def.'s 56.1 Stmt. ¶ 17; Pls.' 56.1 Resp. ¶ 17), and that UBH denied coverage only for the period after January 15, 2012, meaning they did cover more than two weeks of C.H.'s treatment at 3East.  (*See* Ex. 4 UBH Letters at 514 (2/15/2013 Letter) ("As requested, I have completed a review of your medical record for the dates of service of 12/27/11–11/30/2012. . . .  It is my decision to issue a non-coverage determination for residential services for treatment of Major Depressive Disorder effective 1/15/12 and forward.")).

*Second*, Plaintiffs misapprehend pretext.  Pretext implies that a defendant's proffered reasons for doing something are false, used to cover up its genuine motives for a decision which, if actually known, would be improper (for example, violative of the law).  Plaintiffs offer no explanation why UBH could not simply have relied on the supposed pretextual reasons openly, or how such reasons violate any plan provision or legal regulation.  If 3East was out-of-network or not eligible for reimbursement, UBH would have no reason to hide that fact, because a denial on such a ground would not be, as far as the Court can ascertain, improper or in violation of ERISA.  The alleged underlying motives, according to Plaintiffs—that UBH never covers treatment at 3East— would have been legitimate and proper had UBH proffered them, and there would be no reason for UBH to put forward pretextual reasons.

*Third*, in any event, there is little to no evidence of pretextual decision-making by the multiple physician reviewers who independently of each other and over an extended period of time denied C.H.'s appeals.  All Plaintiffs cite to is a 3East registration agreement where insurance information was listed as "SELF PAY," (Def.'s 56.1 Stmt. ¶ 16; Pls.' 56.1 Resp. ¶ 16), and an internal case note that states, "Member was admitted to self pay program at Mclean 3e in 2011 and 2012.  Family is seeking insurance reimbursement for those charges- the 3e program is not contracted and is not [reimbursable] by INN or OON network benefits," (UBH Case Notes, attached as Ex. 4 to Halberg Decl. II, Dkt. No. 44, at 6311; Pls.' 56.1 Stmt. ¶ 36; Def.'s 56.1 Resp. ¶ 36). However, a single case note made by an unidentified administrator does not lead to an inference that the independent review organization and numerous physician reviewers who issued appellate denials over a year-long period were acting on bases other than those they proffered in writing.  The inference of pretext is pure conjecture unsupported by the voluminous record.

II.    Plaintiff's Full and Fair Review Claim

In their Complaint, Plaintiffs lists a separate count under §§ 502(a)(3) and 503(2) of ERISA, which provides for the equitable remedy of a full and fair review. (Compl. ¶¶ 28–35).  Plaintiffs make no effort to differentiate this claim in their briefs from Count I, and the Court concludes that the claim for a full and fair review is duplicative of Plaintiffs' prior claims, as it restates allegations about UBH's regulatory violations, which the Court found to be without merit.  The alleged violations of ERISA that Plaintiffs use as the basis for the full and fair review claim in the Complaint are the same regulatory violations they rely on to argue that the standard of review should be *de*

*novo*. (Pls.' Supp. Br. at 9–10). As explained above, Plaintiffs allegations of regulatory violations are without merit. *See supra* pp. 28–32.

In any event, courts have generally held that claims under § 502(a)(3) do not exist where, as here, Plaintiffs also seek remedy under § 502(a)(1)(B). *See Coriale v. Xerox Corp.*, 775 F. Supp. 2d 583, 598 (W.D.N.Y. 2011) ("'An ERISA plaintiff who has an adequate remedy under § 502(a)(1)(B) cannot alternatively plead and proceed under § 502(a)(3)[.]'") (quoting *Cheal v. Life Ins. Co. of N. Am.*, 330 F. Supp. 2d 1347, 1355 (N.D. Ga. 2004)), *aff'd*, 490 F. App'x 387 (2d Cir. 2012); *Jurgovan v. ITI Enters.*, No. 03-CV-4627, 2004 WL 1427115, at *4 (N.D. Ill. June 23, 2004) ("[T]he fact that alternative pleading is proper under the Federal Rules is irrelevant . . . because the existence of a claim for relief under § 502(a)(1)(B) (as opposed to the receipt of actual relief under tha[t] section) means that relief under § 502(a)(3) is not available as a matter of law.")). Therefore, UBH is entitled to summary judgment for Count II's claim for a full and fair review under § 502(a)(3), since any relief available under Count I renders relief under Count II duplicative. *See, e.g.*, *Giordano v. Coca-Cola Enters. Inc.*, No. 08-CV-391, 2011 WL 839507, at *9 (E.D.N.Y. Mar. 7, 2011) ("[T]he equitable relief sought by plaintiff is duplicative of his claim for benefits. Ultimately, Plaintiff seeks to recover the . . . benefits he believes are due unto him[.] This relief can be adequately achieved through his Section [502](a)(1)(B) claim for benefits and [he] is thus not also entitled to seek the identical relief, even in the alternative, under Section [502](a)(3).").

<u>CONCLUSION</u>

For the reasons stated above, the Court respectfully recommends that UBH's motion for summary judgment be granted and Plaintiffs' motion for summary judgment be denied. The Court also grants the motions of both parties to file under seal, in part,

given the sensitive nature of the medical records in this case.  *See supra* note 1.  The parties may file any exhibits to the motions under seal.  However, to the extent they have not already done so, they should file redacted briefs on the public docket, with unredacted copies under seal.

Any objections to the Report and Recommendation above must be filed with the Clerk of the Court within 14 days of service of this report.  Failure to file objections within the specified time waives the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); *Caidor v. Onondaga Cty.*, 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate[ ] [judge's] report operates as a waiver of any further judicial review of the magistrate[ ] [judge's] decision.").

SO ORDERED.

*/s/ Sanket J. Bulsara* July 30, 2019
SANKET J. BULSARA
United States Magistrate Judge

Brooklyn, New York