UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

SAMUEL SHMARYA HALBERG and C.H.,

                    Plaintiffs,

       v.

UNITED BEHAVIORAL HEALTH, d/b/a
OptumHealth Behavioral Solutions,

                    Defendant.

-----------------------------------------------------------------

**MEMORANDUM & ORDER**
16-CV-6622 (MKB) (SJB)

MARGO K. BRODIE, United States District Judge:

Plaintiffs Samuel Shmarya Halberg and C.H.[1] commenced the above-captioned action on November 30, 2016, against Defendant United Behavioral Health ("UBH"), doing business as OptumHealth Behavioral Solutions. (Compl., Docket Entry No. 1.) Plaintiffs allege that Defendant improperly denied coverage for C.H.'s medical treatment, disregarding C.H.'s treatment records and misapplying Defendant's own "level of care criteria." (*Id.* ¶ 5.) Plaintiffs seek to recover unpaid benefits pursuant to sections 502(a)(1)(B), 502(a)(3), and 503(2) of the Employment Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.* ("ERISA"). (*Id.* ¶¶ 24–35.) The parties cross-move for summary judgment. (Pls. Mot. for Summ. J. ("Pls. Mot."), Docket Entry No. 29; Pls. Mem. in Supp. of Pls. Mot. ("Pls. Mem."), Docket Entry No. 29-1; Def. Mot. for Summ. J. or Alternatively to Stay ("Def. Mot."), Docket Entry No. 38; Def. Mem. in Supp. of Def. Mot. ("Def. Mem."), Docket Entry No. 42-4.)

---

[1] Halberg is C.H.'s father and her appointed authorized representative pursuant to 29 U.S.C. § 1001 *et seq.* ("ERISA"). (Compl. ¶ 6, Docket Entry No. 1.) Halberg is also an attorney and is representing Plaintiffs in this case.

Defendant also moves, in the alternative, to stay the action pending resolution of a related class action, *Wit v. United Behavioral Health*, No. 14-CV-2346, currently before the United States District Court for the Northern District of California. (Def. Mot.; Def. Mem. 17.) On April 9, 2019, the Court referred the motions to Magistrate Judge Sanket J. Bulsara for a report and recommendation. (Order dated April 9, 2019.)

By report and recommendation dated July 30, 2019 ("the R&R"), Judge Bulsara recommended that the Court grant Defendant's motion for summary judgment and deny Plaintiffs' motion for summary judgment. (R&R, Docket Entry No. 49.) Plaintiffs timely objected to the R&R, and Defendant replied to Plaintiffs' objections. (Pls. Obj. to R&R ("Pls. Obj."), Docket Entry No. 50; Def. Reply to Pls. Obj. ("Def. Reply to Obj."), Docket Entry No. 51.)

For the reasons set forth below, the Court adopts the R&R in its entirety and grants Defendant's motion for summary judgment and denies Plaintiffs' motion for summary judgment.

## I. Background

The Court assumes familiarity with the underlying facts as detailed in the R&R and provides only a summary of the pertinent facts.

### a. C.H.'s medical treatment and Defendant's coverage decisions

Plaintiffs were beneficiaries of a group health plan (the "Plan") sponsored by C.H.'s mother's employer, AXA Equitable Life Insurance Company ("AXA"). (Pls. Stmt. of Material Facts Pursuant to L. Rule 56.1 ("Pls. 56.1") ¶ 1, Docket Entry No. 29-2; Def. Stmt. of Material Facts Pursuant to L. Rule 56.1 ("Def. 56.1") ¶ 1, Docket Entry No. 42-3.) Defendant administered the benefits under the Plan. (Pls. 56.1 ¶ 1; Def. 56.1 ¶ 2.)

In September of 2011, following a suicide attempt, C.H. was hospitalized at Weill

Cornell Medical Center ("Weill Cornell"), admitted to the pediatric intensive care unit, and subsequently transferred to adolescent inpatient psychiatric services. (Pls. 56.1 ¶ 5; Def. 56.1 ¶¶ 7–8.) On September 26, 2011, C.H. was discharged from Weill Cornell and admitted to the 2East residential treatment program (the "2East Program") at McClean Hospital ("McClean"), where she remained until December 27, 2011. (Pls. 56.1 ¶¶ 6, 9; Def. 56.1 ¶¶ 11–12.) Defendant approved coverage for C.H.'s treatment at Weill Cornell, as well as for C.H.'s treatment in the 2East Program. (Def. 56.1 ¶¶ 10, 13.)

On December 27, 2011, C.H. left the 2East Program and was admitted to the 3East residential treatment program (the "3East Program"), also at McClean. (Pls. 56.1 ¶¶ 8–9; Def. 56.1 ¶ 14.) While the parties agree that the 3East Program was residential, they disagree as to whether it "provide[d] 24-hour monitoring." (Def. 56.1 ¶ 19; Pls. Resp. to Def. 56.1 ("Pls. 56.1 Resp.") ¶ 19, Docket Entry No. 32-1.) C.H. remained in the 3East Program for nearly a year and a half, until May 8, 2013. (Pls. 56.1 ¶ 9; Def. 56.1 ¶ 17.) Plaintiffs contend that while enrolled in the 3East Program, C.H. "persistently threaten[ed] suicide and engage[d] in cutting and other self-harm." (Pls. 56.1 ¶ 10.) Defendant agrees that C.H. engaged in cutting on fifteen occasions and "continued to have suicidal ideation," but denies that C.H. was actively suicidal, based on medical staffs' failure to describe any of the "cutting incidents . . . as suicide attempts or as life threatening" and medical notes describing "persistent intermittent suicidal thoughts." (Def. Resp. to Pls. 56.1 ("Def. 56.1 Resp.") ¶ 10, Docket Entry No. 42-6.) While C.H. was enrolled in the 3East Program, she was hospitalized on multiple occasions. (Def. 56.1 ¶¶ 34–36.) Defendant approved coverage for each of these hospitalizations. (*Id.* ¶ 47.)

Defendant approved coverage for C.H.'s treatment in the 2East Program from September 26, 2011 through December 27, 2011. (Pls. 56.1 ¶ 17; Def. 56.1 Resp. ¶ 17.) Defendant

approved coverage for C.H.'s stay in the 3East Program from December 27, 2011 through January 14, 2012, but denied coverage for her treatment in the 3East Program from January 15, 2012 through May 8, 2013. (Def. 56.1 ¶ 55; Pls. 56.1 Resp. ¶ 55; Pls. 56.1 ¶ 17; Def. 56.1 Resp. ¶ 17.)

C.H., through Halberg and C.H.'s mother, sought timely administrative review of Defendant's decisions to deny coverage for C.H.'s treatment at the 3East Program from January 15, 2012 to May 8, 2013.  (Def. 56.1 ¶ 49; Pls. 56.1 ¶ 22; Def. 56.1 Resp. ¶ 22.)  After reviewing Plaintiffs' appeals, Defendant's physician reviewers affirmed the denials, concluding that coverage of C.H.'s treatment was not appropriate because "the services [C.H.] was receiving were not consistent with generally accepted standards of medical practice for the noted symptoms at this level of care and were considered inappropriate/inconsistent per UBH Cover Determination Guideline for Major Depressive and Dysthymic Disorder at the residential level of care."  (Def. 56.1 ¶ 51.)  Defendant's physician reviewers further concluded that "treatment could have been provided at a lower level of care and therefore [the services C.H. was receiving] were non-covered health services."  (*Id.* ¶ 52.)  Although Plaintiffs agree that these were the physician reviewers' stated reasons for denying Plaintiffs' appeals, Plaintiffs dispute that "such findings were correct or accurately reflected [Defendant's] true rationale for denying coverage." (Pls. 56.1 Resp. ¶¶ 51–52.)

Plaintiffs sought external review of Defendant's denials by an Independent Review Organization ("IRO").  (Def. 56.1 ¶ 56.)  On January 30, 2015, MCMC, an IRO, "reviewed C.H.'s request for coverage . . . and upheld the decision to deny coverage from January 15, 2012 going forward because treatment 'could have been safely and effectively provided at a lower level of care.'"  (*Id.* ¶¶ 58, 61 (quoting MCMC Decision Notification dated Jan. 30, 2015

("MCMC Decision") Bates-stamped HAL 5795, annexed to Decl. of Denise C. Strait ("Strait Decl.") as Ex. A, Docket Entry No 42-1.) MCMC based its decision on its findings that, *inter alia*, C.H. was (1) "cooperative and effectively engaged in treatment," (2) "had no complicating general medical or clinical or psychiatric features that would necessitate [twenty-four]-hour monitoring or structure of residential level services," (3) "did not display active suicidal behaviors despite chronic suicidal ideation that was amenable to treatment at a lower level of care with intensive services," and (4) "had . . . social support . . . [and] access to intensive treatment and services in the community." (MCMC Decision HAL 5797; *see also* Def. 56.1 ¶ 61; Pls. 56.1 Resp. ¶ 61.)

Defendant contends that MCMC "reviewed the health plan documents, including case notes and correspondence, [C.H.'s] appeal documents, case records . . . case summary, and letters from . . . C.H.'s father and providers," as well as "the Summary Plan Description, level of care guidelines pertaining to residential level services and treatment, and coverage determination guidelines pertaining to depressive disorder." (Def. 56.1 ¶¶ 59–60.) Plaintiffs "[d]ispute[] that MCMC was provided with the relevant health plan documents." (Pls. 56.1 Resp. ¶¶ 59–60.)

### b. Plan documents

The parties disagree as to which documents governed C.H.'s benefits under the Plan.[2]

In a sworn declaration dated May 16, 2018, Michael Francesconi, Senior Director of Benefits at AXA, states that "during the relevant time period" at issue in this case, C.H. was

---

[2] As discussed below, the document that Plaintiffs argue governed C.H.'s benefits designates a different insurance provider, Aetna Life Insurance Company ("Aetna"), to administer claims, suggesting that AXA had previously designated Aetna, instead of Defendant, to administer benefits under the Plan. While the parties dispute which documents governed Defendant's determination of whether C.H.'s treatment was eligible for coverage, they do not dispute that during the relevant period, Defendant administered C.H.'s benefits. (Pls. 56.1 ¶ 1; Def. 56.1 ¶ 2.)

enrolled in a "group health plan" — constituting one "portion" of the welfare benefit program sponsored by AXA (the "AXA Welfare Plan" or "Plan"). (Decl. of Michael A. Francesconi dated May 16, 2018 ("2018 Francesconi Decl.") ¶¶ 1–2, annexed to Def. Mot., Docket Entry No. 38-3.) The "plan document" governing the AXA Welfare Plan consists of "multiple segments," one of which "includes general terms and procedures that govern each of the individual segments of the AXA Welfare Plan." (*Id.* ¶ 3.) In addition to this "[a]dministrative [p]ortion," the plan document includes "separate individual segments . . . that describe the benefits applicable to each particular aspect of the [AXA Welfare] Plan." (*Id.*) Francesconi further attests that the attached "portion of the AXA Welfare Plan document describe[es] the plan benefits for the group health plan in which . . . C.H. was enrolled during the time [period] referenced . . . in this matter." (*Id.* ¶ 5.) The document Francesconi describes is titled "Chapter 2: About [UBH] Medical Coverage Preferred Provider Organization (PPO) Options." (AXA Welfare Plan Document ("UBH SPD"),[3] annexed to 2018 Francesconi Decl. as Ex. B., Docket Entry No. 38-3.) Defendants contend that the UBH SPD governed C.H.'s benefits. (Def. 56.1 ¶ 3.)

The first paragraph of the UBH SPD states, under the heading "[UBH] Medical Coverage," that "[s]ome of the Plan's medical benefits are provided through [UBH]." (UBH SPD 1.) The UBH SPD further states that "[i]f you have enrolled in a [UBH] PPO option, the provisions of this Chapter 2, the current Enrollment Guide and other enrollment information describe the medical coverage that applies to you." (*Id.*) Under the UBH SPD, "Plan benefits

---

[3] The document refers throughout to UnitedHealthcare ("UHC"), and not to UBH. However, Defendant UBH is an affiliate of UHC. (Def. Mem. 2 n.2.) Because the document has been referred to throughout the litigation as the "UBH SPD," and Plaintiffs do not dispute that the document designates Defendant UBH as claims administrator, the Court adopts the same terminology to avoid confusion and refers to UBH in place of UHC for purposes of this Memorandum and Order.

are available only for Covered Health Expenses." (*Id.* at 4.) "Covered Health Services" are

defined as, *inter alia*, "those health services . . . which AXA . . . determines to be[] provided for

the purposes of preventing, diagnosing or treating Mental Illness," "consistent with nationally

recognized scientific evidence as available, and prevailing medical standards and clinical

guidelines," and "not identified in" the Plan's "[e]xclusions" section. (*Id.* at 56.) The document

further states that the "Plan Administrator has delegated to [UBH], as a Claims Administrator,

the exclusive discretion and authority to determine on the Plan's behalf, whether a treatment,

supply or service is a Covered Health Service and how an Eligible Expense will be determined

and otherwise covered under a [UBH] PPO medical option."[4] (*Id.* at 1; *see also id.* at 32.)

Plaintiffs dispute that the UBH SPD governed C.H.'s benefits, (Pls. 56.1 Resp. ¶¶ 4–6),

and instead contend that the governing document is a summary plan description designating

Aetna Life Insurance Company ("Aetna") as the claims administrator, (Pls. 56.1 ¶¶ 27–29;

Excerpts of AXA Summary Plan Description ("Aetna SPD") 1–2, annexed to Decl. of Samuel S.

Halberg ("Halberg Decl.") as Ex. 6, Docket Entry No. 29-5). Like the UBH SPD, the Aetna

SPD is labeled "Chapter 2," and states in the first paragraph, under the heading "Aetna Medical

Coverage," that "[s]ome of the Plan's medical benefits are provided through [Aetna]." (Aetna

SPD 1.) The Aetna SPD does not refer to Defendant, (Pls. 56.1 ¶ 31; Def. 56.1 Resp. ¶ 31), and

instead states that the "Plan Administrator has delegated to Aetna, as a Claims Administrator, the

exclusive discretion and authority to determine on the Plan's behalf, whether a treatment, supply

or service is a Covered Medical Expense and if an amount charged Out-of-Network is considered

a Reasonable and Customary Charge under an Aetna BYO Plan option," (Aetna SPD 2). The

---

[4] The UBH SPD defines "Claims Administrator" to include "UnitedHealthcare . . . and its affiliates," i.e., Defendant. (UBH SPD 55.)

Aetna SPD further explains that "[i]n order to be 'covered', [sic] such expenses must be appropriate for the treatment of an illness . . . and be 'Medically Necessary.'" (*Id.* at 3.) A "service or supply furnished by a particular provider is 'Medically Necessary' if the Claims Administrator determines that it is 'appropriate' for the diagnosis, the care, or the treatment of the illness," which means it is, *inter alia*, "a care or treatment, as likely to produce a significant positive outcome as, and no more likely to produce a negative outcome than, any alternative service or supply," and is "no more costly . . . than any alternative service or supply." (*Id.* at 48–49.)

In support of their respective positions, the parties both rely, in part, on a series of communications between AXA personnel and C.H.'s mother that took place between May of 2013 and October of 2017.

### i. May 31, 2013 Letter

By letter dated May 31, 2013 ("the May 2013 Letter"), Francesconi wrote to C.H.'s mother "to follow-up on [her] recent letter requesting the [SPD] for the AXA Equitable Health Plan . . . for 2011, 2012, [and] 2013." (May 2013 Letter, annexed to Decl. of Michael A. Francesconi dated July 26, 2019 ("2019 Francesconi Decl.") as Ex. A, Docket Entry No. 47-2.) Francesconi explained that "[t]he SPD for those years is comprised of the 2007 SPD *as updated by the summaries of material modifications* regarding Health Plan changes." (*Id.* (emphasis added).)

In addition to the "2007 SPD of the Health Plan" and a number of other documents, Francesconi wrote that he was "enclosing the *revised Chapter 2 of the Health Plan SPD* describing information about the [UBH] Preferred Provider Organization ("PPO") Medical

Options described in the SMMs."[5]  (*Id.* (emphasis added).)  He further explained that the revised chapter of the SPD "*describes the [UBH] PPO medical options in effect January 1, 2011*, unless otherwise noted."  (*Id.* (emphasis added).)

In a sworn statement dated July 26, 2019, Francesconi states that the "document that the parties have been referring to as the 'Aetna SPD'" is a "portion" of the longer "2007 SPD of the Health Plan" he referred to in and enclosed with the May 2013 Letter.  (2019 Francesconi Decl. ¶ 2 & n.1.)  Francesconi also states that the "revised Chapter 2 of the Health Plan SPD" discussed in the May 2013 Letter is the "same document that the parties have been referring to as the 'UBH SPD.'"  (*Id.*)

### ii.    2017 e-mails from Reed and Francesconi

On May 25, 2017, Lisa Reed, a Senior Manager in HR Benefits Administration for AXA, e-mailed C.H.'s mother in response to her request for a "copy of the active health plan SPD." (E-mail dated May 25, 2017 ("May 2017 E-mail") Bates-stamped HALBERG 1, annexed to Halberg Decl. as Ex. 6, Docket Entry No. 29-5.)  In her e-mail, Reed wrote:

> The first attached document (Active Health SPD.1pdf) summarizes the terms of the active health plan in effect as of January 1, 2007 and is known as a Summary Plan Description ("SPD").  For your review, you should refer to this SPD and the subsequent attached annual enrollment guides from 2007 through 2013 for information about the health plan for years 2011 through 2013.[6]

---

[5]  Francesconi has attested that "[t]o the best of [his] recollection, when [he] sent the May 31 Letter, [he] enclosed all of the documents noted in [his] letter."  (2019 Francesconi Decl. ¶ 2.)

[6]  In support of their summary judgment motion, Plaintiffs submitted only "excerpts from the . . . summary plan description" attached to Reed's May 2017 E-mail.  (Halberg Decl. ¶ 7.) The excerpted document consists of (1) a cover page titled Health Plan Summary Plan Description: AXA Equitable Life Insurance Company, and (2) excerpts from the Chapter 2 document describing medical benefits provided by Aetna, i.e., the Aetna SPD, (*see generally* Aetna SPD), and does not include any of the "annual enrollment guides" Reed refers to, (May 2017 E-mail HALBERG 2).

(*Id.* at HALBERG 2.) Reed appears to have attached the same document that Francesconi enclosed with his May 2013 Letter and called the "2007 SPD of the Health Plan," but did not include, as Francesconi did, the "revised Chapter 2," i.e., the UBH SPD. (*See* May 2013 Letter.)

On October 27, 2017, in response to Reed's email, C.H.'s mother wrote to Francesconi that "[t]o satisfy a court request," she had "been asking the Benefits Center for the United Healthcare complete plan documents that governed from 2011 through 2013."[7] (E-mail dated Oct. 17, 2017 ("Oct. 2017 E-mail") Bates-stamped HALBERG 696, annexed to Halberg Decl. as Ex. 8, Docket Entry No. 29-7.) C.H.'s mother noted that she had been "somewhat of a broken record stating repeatedly that Aetna plan documents will not satisfy the request," and asked AXA to "[p]lease provide the United Healthcare SPD and the complete plan documents for 2011 through 2013." (*Id.*)

On November 1, 2017, Francesconi sent the following email to C.H.'s mother:

> We have confirmed that the Summary Plan Description ("SPD") effective January 1, 2007 and the subsequent Summary of Material Modifications ("SMMs") which Ms. Reed provided in her May 26, 2017 email, along with the SMMs included in my May 31, 2013 letter, are the documents which would be used to consider and guide eligibility, plan provisions, statute of limitations and appeal provisions during the requested timeframe (2011-2013). In addition, pursuant to your email request, I have attached the AXA Equitable Life Insurance Company Health and Welfare Plan Document as well.
>
> The United HealthCare ("UHC") [i.e., UBH] Chapter 2, which was enclosed with the May 31, 2013 letter I previously sent you, provided information about the provisions of the [UBH] PPO options in effect January 1, 2011, unless otherwise noted. However, to be clear, there is not a separate stand-alone single document SPD which references [UBH] throughout the document. The applicable documents that we've sent to you represent the Health Plan SPD in effect in 2011, 2012 and 2013.
>
> I hope that this additional clarification and the Plan Document

---

[7] As noted above, Defendant is an affiliate of United Healthcare.

fulfills your request.

(E-mail dated November 1, 2017 ("Nov. 2017 E-mail") Bates-stamped HALBERG 690–91, annexed to Halberg Decl. as Ex. 8, Docket Entry No. 29-7.)

Plaintiffs contend that these emails show that (1) "AXA identified its 2007 Aetna SPD as the operative summary plan description in effect from 2011 through 2013," (Pls. 56.1 ¶ 27), and (2) "AXA disclaimed that the partial United Healthcare document labeled 'Chapter 2' was a summary plan description for the plan," (*id.* ¶ 29).

Defendant disputes that these e-mails establish that the Aetna SPD, and not the UBH SPD, governed the Plan, because (1) "AXA has testified in this matter that the 2007 Aetna SPD is not the proper plan document," (Def. 56.1 Resp. ¶ 27), and (2) Francesconi's statement that the UBH SPD document "provided information about the provisions of the [UBH] PPO options in effect January 1, 2011, unless otherwise noted" does not "suggest[] that AXA 'identified' the 2007 Aetna SPD as the operative plan document during 2011-2013," (*id.* ¶ 27).

Despite the May 2013 Letter enclosing the UBH SPD and explaining that it modified the "2007 SPD of the Health Plan," Plaintiffs contend that the Aetna SPD "is the only summary plan description AXA ever provided to C.H.'s mother in connection with her participation in the AXA plan." (Pls. 56.1 ¶ 28.) However, Plaintiffs do not dispute that they referred to and attached an excerpt from the UBH SPD in their administrative appeals, stating, for example, that:

> Dr. Sanders stated in her denial letters that she reviewed our Summary Plan Description before making a determination. My United Healthcare Choice Plus Certificate for AXA Equitable Health Plan effective January 1, 2011 documents in Chapter 2, Section 6, 'Exclusions,' on page 48, the specific guidelines that are to be utilized when determining medical necessity for mental health and substance abuse treatment. Under Mental Health Health/Substance Use Disorder on page 48, under number 2, it states that coverage is not afforded unless treatment is consistent with several items.

(Excerpt from Admin. Appeal Letter, annexed to Def. Resp. to Pls. Submission Pursuant to Order dated July 15, 2019 ("Def. Resp. to July Order") as Ex. A, [8] Docket Entry No. 47-1.) Plaintiffs then quoted from the UBH SPD, and attached the relevant excerpted page, which they cited as "Summary Plan Description, United Healthcare, Chapter 2." (*Id.* at 6–7 & n.6.)

Defendant did not have a copy of the Aetna SPD in its possession prior to this litigation.[9] (Pls. 56.1 ¶ 32; Def. 56.1 Resp. 56.1 ¶ 32.)

## II. Report and recommendation

Judge Bulsara recommended that the Court grant Defendant's motion for summary judgment and deny Plaintiff's motion for summary judgment.

### a. Judge Bulsara's findings

### i. The operative SPD

Judge Bulsara found that Plaintiffs' arguments that the Aetna SPD was the operative SPD governing C.H.'s health benefits during the relevant period were "without merit" and did not raise a genuine issue of material fact warranting denial of Defendant's summary judgment motion. (R&R 21.) Judge Bulsara reasoned that "even if the UBH SPD were not controlling, there is no basis to use the Aetna SPD in an action against [Defendant]," given that Defendant did not rely on the Aetna SPD in making its coverage decisions and Defendant, not Aetna, was

---

[8] According to Defendant, the excerpt and attachments are from an appeal letter dated October 15, 2013. (Def. Resp. to July Order 1.) The documents are Bates-stamped, indicating they were disclosed during discovery, but a copy of the complete letter was not included in the parties' submissions to the Court. In another appeal letter to Defendant dated July 15, 2013, Plaintiffs again quoted from the UBH SPD and referred to it as the "Summary Plan Description, United Healthcare, Chapter 2." (Admin. Appeal Letter dated July 15, 2013 ("July 15, 2013 Appeal") Bates-stamped HAL 481, annexed to Halberg Decl. as Ex. 1, 485–86 & n.6, Docket Entry No. 29-4.)

[9] The two individuals who provided C.H.'s mother with the Aetna SPD are employees not of Defendant, but of AXA, C.H.'s mother's employer and the sponsor of the Plan.

12

the plan administrator during the relevant time period.  (*Id.*)

Judge Bulsara also concluded that the "arguments being made in [Plaintiffs'] summary judgment motion about the Aetna SPD and the inapplicability of the UBH SPD were never made below," and could not be "consider[ed by the Court] in determining whether the administrator's coverage denial should be set aside."  (*Id.* at 22–23.)  Judge Bulsara further concluded that because Plaintiffs have not shown good cause for the Court to consider evidence outside the administrative record, the Court cannot consider Plaintiffs' argument that because Plaintiffs only ever received the Aetna SPD, the Court must consider the Aetna SPD.  (*Id.* at 24–25.)

Finally, Judge Bulsara noted that Plaintiffs' "alleged failure to receive the UBH SPD has far less significance than Plaintiffs believe," because, *inter alia*, Plaintiffs "do not explain why the failure to have a copy prior to the benefits denial undermines the decision reached on administrative appeal."  (*Id.* at 25–26.)

For all these reasons, Judge Bulsara "focus[ed]" his "inquiry" on the UBH SPD.  (*Id.* at 26.)

### ii.   Standard of review

Judge Bulsara recommended that the Court review Defendant's denials of coverage under an arbitrary and capricious standard.  (*Id.* at 33.)  Judge Bulsara based this conclusion on his findings that (1) the UBH SPD grants discretionary authority to Defendant and (2) Defendant did not violate any ERISA regulations.  (*Id.* at 28–29.)

Judge Bulsara found Plaintiffs' arguments as to all four alleged regulatory violations to be without merit.  (*Id.* at 29.)  In addressing each argument in turn, Judge Bulsara found the following.  First, Defendant did not commit a regulatory violation by failing to cite to and rely on the Aetna SPD because Defendant is not required to follow a different administrator's SPD, and

the regulation does not require an administrator to cite to specific plan provisions of a plan document the administrator has not relied on in making its coverage determinations. (*Id.* at 29–30.) Second, Plaintiffs have not established that Defendant failed to take into account certain medical records. (*Id.* at 30–31.) The administrative record shows that these documents were considered in the review process; the fact that Defendant did not specifically cite to them in their denials "does not mean this evidence was ignored." (*Id.*) Third, Plaintiffs' contention that Defendant improperly afforded deference to the initial benefit determination is not supported by the record, which shows only that Defendant restated the bases on which benefits had initially been denied, and not that Defendant was giving any special deference to those decisions. (*Id.* at 31–32.) Finally, Plaintiffs have not established that Defendant violated 29 C.F.R. § 2560.503-1(h)(3)(iv), because that regulation merely required Defendant to have a procedure in place to provide Plaintiffs with the identifications of experts involved in denying coverage upon request, and Plaintiffs have not shown they requested this information. (*Id.* at 32–33.)

Because Judge Bulsara found no regulatory violations, he did not address "whether such regulatory violations, if established, would result in *de novo* review," (*id.* at 29 n.12), though he noted that "Plaintiffs have cited no case where any court has, based on finding any of the identified regulatory violations, chosen to conduct a *de novo* review," (*id.* at 33).

### iii. Arbitrary and capricious review

Judge Bulsara found that there were no "evidentiary failings or procedural errors that would render [Defendant's] decisions arbitrary and capricious." (*Id.* at 35.) In reaching this conclusion, Judge Bulsara emphasized that, while Plaintiffs had "cited to record evidence that is in tension with . . . [Defendant's] conclusions and suggest a different result could have been reached by the [Defendant] administrators . . . [,] that is not sufficient for Plaintiffs to prevail"

before a district court conducting arbitrary and capricious review. (*Id.* at 36.) Reviewing the administrative record, Judge Bulsara found that the conclusions upon which Defendant based its denials were "supported by substantial evidence." (*Id.* at 39.) Judge Bulsara noted that "while there is evidence C.H. had suicidal ideation at times and medical records showed a worsening mood, there is a multitude of evidence, relied upon by [Defendant], that suggests that C.H. had made significant progress, had improved mood, was not suicidal, and due to those improvements did not need to be in a full-time residential facility for a [sixteen]-month period." (*Id.* at 41.)

Judge Bulsara next considered Plaintiffs' arguments that (1) Defendant's "determination is in tension with [Defendant's] own criteria for inpatient care," and (2) Defendant "did not have access to the correct SPD," i.e., the Aetna SPD, and "therefore failed to use the correct definition of 'medically necessary' as specified in that document." (*Id.* at 42.) As to the first argument, Judge Bulsara found that Plaintiffs had not demonstrated that Defendant was required to privilege the Level of Care Guidelines for Mental Health Conditions over its Coverage Determination Guidelines for Major Depressive Disorder. (*Id.* at 42–43.) As to the second argument, Judge Bulsara again emphasized that Defendant was not required to rely on a different administrator's SPD, and therefore that it did not possess or rely on the Aetna SPD in making its coverage determinations is irrelevant. (*Id.* at 44–45.) Judge Bulsara further noted that Defendant's denials did not refer to "or rely on a concept of medical necessity," but "instead referred to the non-covered services as 'excluded'" — a term that is defined in the UBH SPD. (*Id.* at 45.)

In addressing Plaintiffs' argument that Defendant "simply used medical necessity as a pretext for denying a service that [Defendant] considered unavailable for reimbursement," (*id.*), Judge Bulsara found that: (1) "the record contradicts the claim that [Defendant] would never

cover [the 3East Program]," (*id.* at 46); (2) while "[p]retext implies that a defendant's proffered reasons for doing something are . . . used to cover up its genuine [and illegal] motives . . . [Defendant] would have no reasons to hide" that the 3East Program was not reimbursable, (*id.*); and (3) the "single case note made by an unidentified administrator" Plaintiffs cite to in support of their pretext argument does not warrant such an inference, (*id.* at 47).

### iv. Full and fair review claim

Turning to Plaintiffs' cause of action under sections 502(a)(3) and 503(2) of ERISA, Judge Bulsara concluded that Plaintiffs' claim for a full and fair review must also fail because Plaintiffs rely on the same alleged ERISA violations as they do in arguing for *de novo* review, all of which Judge Bulsara found Plaintiffs had failed to establish. (*Id.* at 47–48.) Judge Bulsara also found that, regardless of the merits of Plaintiffs' claim, because relief would be duplicative of any relief granted pursuant to section 502(a)(1)(B), Defendant must prevail on summary judgment as to Plaintiffs' claim under sections 502(a)(3) and 503(2). (*Id.* at 48.)

## II. Discussion

### a. Standards of review

#### i. Report and recommendation

A district court reviewing a magistrate judge's recommended ruling "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). When a party submits a timely objection to a report and recommendation, the district court reviews *de novo* the parts of the report and recommendation to which the party objected. *Id.*; *see also United States v. Romano*, 794 F.3d 317, 340 (2d Cir. 2015). The district court may adopt those portions of the recommended ruling to which no timely objections have been made, provided no clear error is apparent from the face of the record. *John Hancock Life Ins. Co. v. Neuman*, No. 15-CV-1358, 2015 WL 7459920, at *1

(E.D.N.Y. Nov. 24, 2015).  The clear error standard also applies when a party makes only

conclusory or general objections.  *Benitez v. Parmer*, 654 F. App'x 502, 503–04 (2d Cir. 2016)

(holding that "general objection[s] [are] insufficient to obtain de novo review by [a] district

court" (citations omitted)); *see* Fed. R. Civ. P. 72(b)(2) ("[A] party may serve and file specific

written objections to the [magistrate judge's] proposed findings and recommendations."

(emphasis added)); *see also Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) ("Merely

referring the court to previously filed papers or arguments does not constitute an adequate

objection under . . . Fed. R. Civ. P. 72(b)." (quoting *Mario v. P & C Food Mkts., Inc.*, 313 F.3d

758, 766 (2d Cir. 2002))).

### ii.  Summary judgment

Summary judgment is proper only when, construing the evidence in the light most

favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Wandering Dago, Inc. v.

Destito*, 879 F.3d 20, 30 (2d Cir. 2018); *see also Cortes v. MTA N.Y.C. Transit*, 802 F.3d 226,

230 (2d Cir. 2015).  The role of the court "is not to resolve disputed questions of fact but only to

determine whether, as to any material issue, a genuine factual dispute exists."  *Rogoz v. City of

Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d

537, 545 (2d Cir. 2010); and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50

(1986)).  A genuine issue of fact exists when there is sufficient "evidence on which the jury

could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.  The "mere existence of a

scintilla of evidence" is not sufficient to defeat summary judgment.  *Id.*  The court's function is

to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the

nonmoving party, a rational juror could find in favor of that party."  *Pinto v. Allstate Ins. Co.*,

221 F.3d 394, 398 (2d Cir. 2000).

### b. Objections to the R&R

### i. Plaintiffs' objections to the R&R

Plaintiffs object to Judge Bulsara's finding that Defendant was not required to consider the Aetna SPD, and to his recommendation that the UBH SPD governs C.H.'s benefits. (Pls. Obj. 3–6.) Plaintiffs also object to Judge Bulsara's conclusion that Plaintiffs have waived any arguments about which SPD governs because they failed to raise them during the administrative process. (*Id.* at 6.)

Plaintiffs further object to Judge Bulsara's finding that the UBH SPD's failure to define "Medically Necessary" did not matter because Defendant did not rely on medical necessity in denying coverage. (*Id.* at 7.) In addition, Plaintiffs argue that if, as Judge Bulsara concluded, Defendant based its denials of coverage on the "application of an 'exclusion' for non-covered services" in the UBH SPD, then Defendant's "determination is not subject to either 'abuse of discretion' or '*de novo*' review [but i]nstead [Defendant] . . . bears the burden of proving by a preponderance of evidence that the denial was correct." (*Id.* at 8 (emphasis omitted).)

Plaintiffs also object to Judge Bulsara's conclusion that the arbitrary and capricious standard is the appropriate standard of review and to the underlying findings that support his conclusion, namely that (1) Defendant's "failure to cite to and rely on the Aetna SPD was not a procedural error because [Defendant] was not required to rely on the Aetna SPD," (*id.* at 10), and (2) Plaintiffs have not demonstrated that, in the administrative appeals process, Defendant failed to consider evidence or improperly gave deference to the initial decision, (*id.* at 10–11).

Plaintiffs also object to Judge Bulsara's disregard of Defendant's argument that it denied C.H. coverage because the 3East Program's services were "luxury" and "non-traditional." (*Id.* at 9.) While Judge Bulsara declined to consider these arguments because they were not raised in the administrative process, Plaintiffs argue that Defendant's "shifting rationale" is itself a

procedural violation requiring that the Court review Defendant's denials *de novo*. (*Id.*)

Finally, Plaintiffs object to Judge Bulsara's finding that Defendant's denial of coverage was not arbitrary and capricious, based on the "overwhelming evidence that residential care was medically necessary for C.H." and "because it explicitly contradicted not only the Aetna SPD's definition of 'Medically Necessary,' but also [Defendant's] own internal Level of Care Guidelines . . . for Residential Care." (*Id.* at 11–12.)

### ii. Unopposed findings and recommendations in the R&R

No party has objected to Judge Bulsara's findings that there is no genuine issue of material fact as to whether (1) Defendant violated 29 C.F.R. § 2560.503-1(h)(3)(ii) by showing improper deference in the administrative appeal process to the initial adverse benefit determinations, or (2) Defendant violated 29 C.F.R. § 2560.503-1(h)(3)(iv) by failing to disclose the identity of the external expert reviewer.

The Court therefore reviews these findings and recommendations for clear error. Having reviewed the relevant portions of the R&R and finding no clear error, the Court adopts these recommendations pursuant to 28 U.S.C. § 636(b)(1).

### c. Plaintiffs' section 502(a)(1)(B) ERISA claim

Section 502(a)(1)(B) of ERISA provides that a "civil action may be brought . . . by a participant . . . to recover benefits due to him under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B). "A claim for benefits under ERISA is the assertion of a contractual right." *Knopick v. Metro. Life Ins. Co.*, 457 F. App'x 25, 28 (2d Cir. 2012) (citing *Feifer v. Prudential Ins. Co. of Am.*, 306 F.3d 1202, 1210 (2d Cir. 2002). "To adjudicate" a claim under section 502(a)(1)(B), "a court necessarily must identify the terms of the plan." *Feifer*, 306 F.3d at 1208 (citation and internal quotation marks omitted). "In interpreting plan terms for purposes of claims under [section 502(a)(1)(B)]," the Second Circuit applies the "federal common law of

contract, informed both by general principles of contract law and by ERISA's purposes as manifested in its specific provisions." *Id.* at 1210.

Under ERISA, "[t]he plan's sponsor (*e.g.,* the employer) . . . creates the basic terms and conditions of the plan [and] executes a written instrument containing those terms and conditions." *CIGNA Corp. v. Amara*, 563 U.S. 421, 437 (2011). "The plan's administrator . . . manages the plan, follows its terms in doing so, and provides participants with the summary documents that describe the plan (and modifications) in readily understandable form." *Id.*; *see also* 29 U.S.C. § 1022(a) ("A summary plan description [and a summary of any material modification] . . . shall be furnished to . . . beneficiaries"; "written in a manner calculated to be understood by the average plan participant"; and "be sufficiently accurate and comprehensive to reasonably apprise such . . . beneficiaries of their rights and obligations under the plan.").

"Summary documents do not necessarily constitute the *terms* of the plan," *Amara*, 563 U.S. at 438, though "courts . . . have blessed the practice of plan sponsors . . . using a single document to function as both an SPD and a written instrument," *Northwell Health Inc. v. Lamis*, No. 18-CV-1178, 2019 WL 4688704, at *5 (S.D.N.Y. Sept. 25, 2019) (citations, internal quotation marks, and alteration omitted). The statute "contemplates that the summary [plan description] will be an employee's primary source of information regarding employment benefits, and employees are entitled to rely on the descriptions contained in the summary." *Layaou v. Xerox Corp.*, 238 F.3d 205, 209 (2d Cir. 2001) (alteration in original) (quoting *Heidgerd v. Olin Corp.*, 906 F.2d 903, 907–08 (2d Cir. 1990)).

The Court addresses each of Plaintiffs' arguments below.

### i.    The operative SPD

Plaintiffs' arguments on summary judgment rely in large part on the claim that the Aetna SPD governed C.H.'s benefits plan, a claim Defendant disputes.  Accordingly, the Court addresses this issue first.

### 1.    The Aetna and UBH SPDs

Plaintiffs argue that the Aetna SPD governed C.H.'s benefits during the relevant period. This is significant, in Plaintiffs' view, because the Aetna SPD contains a definition of "medically necessary" that Plaintiffs argue required Defendant to cover C.H.'s treatment in the 3East Program.  (Pls. Mem. 7.)  The UBH SPD, in contrast, does not contain a definition of "medically necessary," despite capitalizing the term, "suggesting it is a defined term."  (*Id.* at 8.)  Plaintiffs argue that the Aetna SPD is "the only plan document that actually supplied a contractual definition of 'Medically Necessary.'" (Pls. Reply in Supp. of Pls. Mot. ("Pls. Reply") 2, Docket Entry No. 37.)  In addition, Plaintiffs argue that because Defendant did not have access to the Aetna SPD prior to this litigation, (Pls. 56.1 ¶ 32; Def. 56.1 Resp. ¶ 32), this resulted in "both procedural and substantive impacts" — namely, that Defendant could not have complied with certain ERISA regulations, and necessarily applied an incorrect standard in determining C.H.'s treatment was not medically necessary.[10]  (Pls. Reply 2, 4.)

---

[10]    While Plaintiffs characterize Defendant's denials as based on findings that C.H.'s care was not medically necessary, the record suggests otherwise.  A representative letter from Defendant denying coverage for C.H.'s treatment indicates instead that Defendant found the services she received at the 3East Program were "not appropriate for [her] . . . condition and [were] therefore non-covered health services."  (Initial Denial Letter dated Feb. 15, 2013 Bates-stamped HAL 514, annexed to Halberg Decl. as Ex. 4, Docket Entry No. 30-4.)  In their objections to the R&R, Plaintiffs argue that Judge Bulsara's finding that Defendant did not rely on medical necessity in denying coverage is "clearly contradicted by the record."  (Pls. Obj. 7.) However, in support, Plaintiffs cite not to the administrative record, but instead to Defendant's arguments on summary judgment.  (*Id.*)

Defendant argues that C.H.'s benefits were governed by the UBH SPD, not the Aetna SPD, and that, in accordance with that document, C.H.'s "Plan . . . [did] not provide coverage for mental health services that 'in the reasonable judgment' of [Defendant] '[were] not clinically appropriate for the patient's Mental Illness' or [were] 'not consistent with generally accepted standards of medical practice for treatment of such conditions.'" (Defs. Mem. 3 (quoting UBH SPD at 56).)

## 2. July 2019 Order

By Order dated July 15, 2019 (the "July Order") — after the parties had fully briefed their summary judgment motions — Judge Bulsara directed Plaintiffs to "identify those portions of the administrative record where they previously asserted (1) that the Aetna SPD, as opposed to the UBH SPD, was the governing Summary Plan Description; and (2) that they never received the UBH SPD." (Order dated July 15, 2019.)

In response to the July Order, Plaintiffs acknowledged that "[t]hese issues were not raised during the administrative process," but argue that this was "because they first arose in the context of this litigation, years after Plaintiffs exhausted their administrative appeals." (Plaintiffs' Submission pursuant to Order dated July 25, 2019 ("Pls. July Order Resp.") 1, Docket Entry No. 46.) Plaintiffs contend that "[i]t was not until discovery in this litigation that UBH first contended, in contradiction of AXA itself, that the UBH 'Chapter 2' document was the sole SPD governing the Plan," and that "Plaintiffs learned that [Defendant] did not have access to the 2007 Aetna SPD." (*Id.* at 1–2.)

Defendant disputes Plaintiffs' claim that these issues first arose in the instant action, and argues instead that "during the claims process Plaintiffs repeatedly acknowledged that the UBH SPD was the controlling Plan document" — an "especially significant" fact given that "at that

time, [Plaintiffs] had received copies of both [SPDs]." (Def. Resp. to July Order 1–2 (emphasis omitted).) In support, Defendant attached an excerpt from one of Plaintiffs' appeals, quoting from and attaching a portion of the UBH SPD, and referring to it as "Summary Plan Description, United Healthcare, Chapter 2," (Excerpt from Admin. Appeal Letter), and Francesconi's May 2013 Letter attaching both SPDs, (May 2013 Letter).

### 3. Scope of review

"When reviewing claim denials, whether under the arbitrary and capricious or *de novo* standards of review, district courts typically limit their review to the administrative record before the plan at the time it denied the claim." *Halo v. Yale Health Plan*, 819 F.3d 42, 60 (2d Cir. 2016). "The doctrine limiting review of ERISA claims to evidence before the plan administrator was developed to prevent federal courts from becoming 'substitute plan administrators' and thus to serve ERISA's purpose of providing 'a method for workers and beneficiaries to resolve disputes over benefits inexpensively and expeditiously.'" *Daniel v. UnumProvident Corp.*, 261 F. App'x 316, 318 (2d Cir. 2008) (quoting *Perry v. Simplicity Eng'g*, 900 F.2d 963, 966–67 (6th Cir. 1990)).

"[T]he decision whether to admit additional evidence is one which is discretionary with the district court, but which discretion ought not to be exercised in the absence of good cause." *DeFelice v. Am. Int'l Life Assur. Co. of N.Y.*, 112 F.3d 61, 66 (2d Cir. 1997); *see also S.M. v. Oxford Health Plans (N.Y.)*, 644 F. App'x 81, 84 (2d Cir. 2016) ("In ERISA cases applying the arbitrary and capricious standard of review, we have repeatedly said that a district court's decision to admit evidence outside the administrative record is discretionary, but which discretion ought not to be exercised in the absence of good cause." (citation and internal quotation marks omitted) (quoting *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 631 (2d

Cir. 2008))); *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 125 (2d Cir. 2003) ("The decision whether to consider evidence from outside the administrative record is within the discretion of the district court. Nonetheless, the presumption is that judicial review 'is limited to the record in front of the claims administrator unless the district court finds good cause to consider additional evidence.'" (citation omitted) (quoting *DeFelice*, 112 F.3d at 67)).

Good cause may exist where there is a "demonstrated conflict of interest in the administrative reviewing body," *Halo*, 819 F.3d at 60 (quoting *DeFelice*, 112 F.3d at 67), or where a "plan's failure to comply with the claims-procedure regulation adversely affected the development of the administrative record," *Halo*, 819 F.3d at 60. Courts have also found good cause where "[a]n administrator's failure to inform a [claimant] of a reason for denial [has] deprive[d] the [claimant] of the ability to make a contrary case to the administrator." *Juliano v. Health Maint. Org. of New Jersey, Inc.*, 221 F.3d 279, 288 (2d Cir. 2000) (finding that the district court had acted within it discretion by considering evidence outside the administrative record where plaintiffs "were not told that they were being denied reimbursement . . . on the grounds that it was not 'medically necessary,'" and therefore could not "be faulted for having failed to provide . . . evidence of medical necessity" in their administrative appeal). A plaintiff "seeking to present evidence outside of the administrative record" bears the "burden of proof to establish good cause." *Garg v. Winterthur Life*, 573 F. Supp. 2d 763, 771 (E.D.N.Y. 2008) (citing *Trussel v. Cigna Life Ins. Co. of N.Y.*, 552 F. Supp. 2d 387, 390 (S.D.N.Y. 2008)); *see also Sanford v. TIAA-CREF Individual & Inst'l Servs., LLC*, 612 F. App'x 17, 19–20 (2d Cir. 2015) (citing *DeFelice*, 112 F. 3d at 67).

Plaintiffs have not demonstrated good cause for the Court to consider evidence outside the administrative record. Plaintiffs have not suggested that Defendant had a conflict of interest

in reviewing C.H.'s claims, and the evidence in the record demonstrates there was no such conflict.  (*See* Strait Decl. ¶¶ 2–5.)  For the reasons stated below, Plaintiffs have not shown that Defendant committed procedural violations that might give the Court good cause to exercise its discretion to consider outside evidence.  Nor have Plaintiffs demonstrated that they have been prejudiced in some way in their ability to create an administrative record.  While Plaintiffs now argue that the Aetna SPD governs their claim, the evidence shows that in their administrative appeals, Plaintiffs relied on the UBH SPD — in other words, they relied on the same document that Defendant argues governs their claim.  While the Court is sympathetic to the less-than-clear nature of the process and explanations provided by AXA, the evidence currently before the Court does not demonstrate that Plaintiffs believed Defendant was relying on the Aetna SPD, and therefore does not demonstrate that Plaintiffs were deprived of the ability to effectively make an administrative record.[11]

---

[11]  Nor does Second Circuit law require the Court to consider the Aetna SPD.  In *Daniel v. UnumProvident Corporation*, the Second Circuit explained that the "concern" about federal courts becoming substitute plan administrators "is not implicated in cases where the extraneous evidence being offered goes to a question that was not, or could not have been, under consideration by the plan administrator."  261 F. App'x at 318.  The Court of Appeals reasoned that the document at issue "was offered not to establish a historical fact pertaining to the merits of [plaintiff's] claim — for example, that [plaintiff] suffered from any particular ailment or experienced any kind of pain — but rather to establish which entity actually decided her claim and therefore which standard of review was applicable in federal court."  *Id.*  Because "this question was not, and could not have been, before the plan administrator," the *Daniel* Court found "no cause for concern in the district court's considering the [document] to determine which standard of review applies."  *Id.*

*Daniel* is distinguishable from the facts of this case.  While the Aetna SPD is not evidence of C.H.'s medical needs, it does speak to a question that could have been, and was, before the plan administrator, namely whether C.H.'s treatment was covered by her benefits plan. In reviewing C.H.'s claims, Defendant relied on the relevant plan documents to determine whether her care was covered.  In appealing Defendant's denials, Plaintiffs cited to plan documents, including the UBH SPD.  To the extent Plaintiffs believed that Defendant should have been relying on the Aetna SPD — a document that was in Plaintiffs' possession, and not Defendant's — Plaintiffs could have submitted that document to Defendant.

### ii. Standard of review

Defendant argues that the Court should review its coverage determinations under the arbitrary and capricious standard because (1) the Plan gave Defendant discretion to determine whether benefits were covered, (Defs. Mem. 10), (2) Defendant, in its role as administrator, had no conflict of interest, (*id.* at 16–17), and (3) "Plaintiffs have failed to demonstrate that

---

Regardless, even assuming that *Daniel* requires the Court to consider the Aetna SPD, the Court finds that Plaintiffs have failed to create a genuine issue of material fact as to whether Defendant was required to consider the Aetna SPD. As an initial matter, as Judge Bulsara noted, Plaintiffs have not pointed to any authority that "permits [Plaintiffs] to challenge an administrator's benefits denial based on an SPD issued by a prior administrator." (R&R 21.) Furthermore, the evidence shows that the UBH SPD governed C.H.'s benefits during the relevant period, that Plaintiffs had received a copy of the UBH SPD as early as May of 2013, and that Plaintiffs relied on the UBH SPD in appealing Defendant's denials. Francesconi, AXA's senior director of benefits, stated under oath that the UBH SPD was the operative plan document during the relevant period. (2018 Francesconi Decl. ¶ 5.) In his May 2013 Letter, Francesconi specifically advised C.H.'s mother that the "revised Chapter 2 of the Health Plan," i.e., the UBH SPD, modified the "2007 SPD of the Health Plan" and "describe[d] the [UBH] PPO medical options in effect [as of] January 1, 2011." (May 2013 Letter.) Plaintiffs subsequently relied on the UBH SPD — and never the prior version of Chapter 2, i.e., the Aetna SPD — in their administrative appeals. (*See, e.g.*, July 15, 2013 Appeal HAL 481, 485–86 & n.6.) When, in May of 2017, AXA again provided C.H.'s mother with the full 2007 SPD but failed to attach the revised "Chapter 2," i.e., the UBH SPD, C.H.'s mother replied that she needed the UBH plan documents. (Oct. 2017 E-mail HALBERG 696.) In response, Francesconi reiterated that the UBH SPD included in his May 2013 Letter "provided information about the provisions of the [UBH] PPO options in effect January 1, 2011." (Nov. 2017 E-mail HALBERG 690–91.)

The Court also rejects as unpersuasive Plaintiffs' reliance on *Gannon v. NYSA-ILA Pension Tr. Fund & Plan*, No. 09-CV-10368, 2011 WL 868713 (S.D.N.Y. Mar. 11, 2011), to argue that "even if Plaintiffs had been aware of these disputes during the administrative process, they would not have been obligated to raise them at that time [because] . . . 'the case law does not require an ERISA plaintiff to articulate all of his or her legal theories during the administrative process as a prerequisite for using these arguments in district court.'" (Pls. Resp. to July Order 2) (quoting *Gannon*, 2011 WL 868713, at *6). As Defendant notes, the district court in *Gannon* held that "an issue or theory that is raised in court proceedings must be based on information or evidence that was actually before the plan administrators." *Gannon*, 2011 WL 868713, at *5. As discussed above, the Aetna SPD was not before Defendant during the administrative process, and Plaintiffs, despite being in a position to put it before Defendant, did not do so. Even assuming, without deciding, that Plaintiffs are permitted to raise the argument, for the reasons stated above, the Court finds that Plaintiffs have not sufficiently presented evidence to raise an issue of material fact as to the operative SPD.

[Defendant] engaged in any procedural errors that would affect the applicable standard of review," (Def. Opp'n to Pls. Mot ("Def. Opp'n") 7, Docket Entry No. 39).

Plaintiffs argue that the Court should review Defendant's denials under a *de novo* standard of review because Defendant "failed to comply with the [ERISA] claims procedure regulation in numerous material respects."  (Pls. Mem. 9.)

"When a plaintiff asserts a claim for benefits due, [federal courts] review the plan administrator's decision de novo unless the benefit plan gives the administrator . . . discretionary authority to determine eligibility for benefits or to construe the terms of the plan, in which case an arbitrary and capricious standard applies."  *In re DeRogatis*, 904 F.3d 174, 187 (2d Cir. 2018) (internal quotation marks omitted) (quoting *Halo*, 819 F.3d at 51 (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989))); *see also S.M.*, 644 F App'x at 83 ("An administrator's decision to deny benefits is ordinarily reviewed de novo; but if, as here, written plan documents confer upon a plan administrator the discretionary authority to determine eligibility, we will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious." (internal quotation marks omitted) (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995))); *Locher v. Unum Life Ins. Co. of Am.*, 389 F. 3d 288, 293 (2d Cir. 2004) ("Where an ERISA plan does not accord an administrator 'discretionary authority to determine eligibility for benefits or to construe the terms of the plan,' a district court reviews all aspects of an administrator's eligibility determination, including fact issues, *de novo*." (footnote omitted) (quoting *Firestone*, 489 U.S. at 115)); *Garg*, 573 F. Supp. at 769 ("Following the [Supreme] Court's determination in *Firestone*, the Second Circuit has stated that 'where a plan does confer discretion upon the administrator to determine eligibility or interpret the terms of the plan, the determinations of the administrator are reviewed under an abuse of discretion

standard.'" (quoting *Kosakow v. New Rochelle Radiology Assocs, P.C.*, 274 F.3d 706, 738 (2d Cir. 2001))).

"As an initial matter, '[t]he plan administrator bears the burden of proving that the deferential standard of review applies.'" *Garg*, 573 F. Supp. 2d at 770 (quoting *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002)); *see also Krauss*, 517 F.3d at 622 ("If the insurer establishes that it has such discretion, the benefits decision is reviewed under the arbitrary and capricious standard." (quoting same)).

### 1. Discretion to administrator

Defendant argues that "there is no meaningful dispute that the Plan gives [Defendant] the requisite discretionary authority" given the plain terms of the UBH SPD. (Defs. Mem. 10.)

Plaintiffs argue that the Plan did not give Defendant discretion because the Aetna SPD, not the UBH SPD, governs; Plaintiffs do not appear to dispute that the language of the UBH SPD itself confers discretion. (Pls. Opp'n 7–8.)

"A reservation of discretion need not actually use the words discretion or deference to be effective, but it must be clear. . . . In general, language that establishes an objective standard does not reserve discretion, while language that establishes a subjective standard does." *Krauss*, 517 F.3d at 622 (citation and internal quotation marks omitted) (quoting *Nichols v. Prudential Ins. Co. of America*, 406 F.3d 98, 108 (2d Cir. 2005)).

The UBH SPD states that:

> [t]he Plan Administrator has delegated to [United Healthcare], as a Claims Administrator, the *exclusive discretion and authority to determine* on the Plan's behalf, *whether a treatment, supply or service is a Covered Health Service* and how an Eligible Expense will be determined an otherwise covered under a UHC PPO medical option.

(UBH SPD 1 (emphasis added).) "Claims Administrator" is defined as "UnitedHealthcare . . .

and its affiliates, who provide certain claim administration services for the Plan." (UBH SPD 55.) Defendant UBH is an affiliate of UHC. (Defs. Mem. 2 n.2.) As this language makes clear, the Plan grants Defendant discretionary authority to determine eligibility. *See Kim v. Hartford Life Ins. Co.*, 748 F. App'x 371, 373 (2018) (finding arbitrary and capricious review appropriate where plan gave administrator "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the [p]olicy").

Plaintiffs apparently agree that the UBH SPD gives discretion to Defendant: "The only document gra[n]ting [Defendant] discretion to determine plan benefits is the 'Chapter 2' document [i.e., the UBH SPD], which AXA does not identify as a governing document for the plan." (Pls. Mem. 9 n.3.) Plaintiffs instead argue that the Aetna SPD, not the UBH SPD, governed C.H.'s benefits plan.[12] They argue that Defendant's "discretionary authority is itself unclear, as the operative SPD for the AXA plan does not identify [Defendant] as an administrator of the plan at all" — in other words, the Aetna SPD, unsurprisingly, does not grant discretionary authority to Defendant. (*Id.*)

Accordingly, the Court finds that the Plan gave Defendant discretionary authority triggering arbitrary and capricious review.[13]

---

[12] The Aetna SPD has nearly identical discretion conferring language: "The Plan Administrator has delegated to Aetna, as a Claims Administrator, the exclusive discretion and authority to determine on the Plan's behalf whether a treatment, supply or service is a Covered Medical Expense and if an amount charged Out-of-Network is considered a Reasonable and Customary Charge under an Aetna BYO Plan option." (Aetna SPD 2.)

[13] In their objections to the R&R, Plaintiffs argue that if, as Judge Bulsara concluded, Defendant had denied coverage for C.H.'s treatment pursuant to an exclusion in the UBH SPD, the standard of review would be "dramatically alter[ed]." (Pls. Obj. 8.) Plaintiffs contend that, if this is the case, Defendant's "determination is not subject to either 'abuse of discretion' or '*de novo*' review," and "[i]nstead [Defendant] *actually bears the burden of* proving by a preponderance of evidence that the denial was correct." (*Id.*) Plaintiffs' claim that neither standard of review applies is directly contradicted by the two cases they cite. In *Critchlow v.*

## 2. Regulatory violations

Plaintiffs argue that the Court should review Defendant's denials *de novo* because Defendant violated various regulatory provisions of ERISA. (Pls. Mem. 9.) Defendant disputes that Plaintiffs have demonstrated that Defendant violated any such regulatory provisions. (Def. Opp'n 4.)

"Even when [a] plan confers . . . discretion, [courts] review de novo those cases in which a plan 'fail[s] to comply with the Department of Labor's claims-procedure regulation[s],' unless that failure 'was inadvertent *and* harmless' with regard to the claim at issue." *In re DeRogatis*, 904 F.3d at 187 (alterations in original) (quoting *Halo*, 819 F. 3d at 58); *see also Halo*, 819 F.3d at 45 ("Specifically, we hold that, when denying a claim for benefits, a plan's failure to comply with the Department of Labor's claims-procedure regulation, 29 C.F.R. § 2560.503–1, will result in that claim being reviewed *de novo* in federal court, unless the plan has otherwise established procedures in full conformity with the regulation and can show that its failure to comply with the regulation in the processing of a particular claim was inadvertent *and* harmless."). A plan

---

*First UNUM Life Ins. Co. of Am.*, 378 F.3d 246 (2d Cir. 2004), both the district court and the court of appeals reviewed the defendant's decision *de novo*. *Id.* at 253, 261. In *Mario v. P & C Food Markets*, 313 F.3d 758 (2d Cir. 2002), while the court noted there was "some uncertainty as to the [applicable] standard of review," that uncertainty related to whether or not the plan granted discretionary authority to the administrator, i.e., whether *de novo* or arbitrary and capricious review applied. *Id.* at 763. In *Critchlow*, the court noted that "as a matter of general insurance law, the insured has the burden of proving that a benefit is covered, while the insurer has the burden of proving that an exclusion applies . . . and these principles too are applicable in ERISA cases." 378 F.3d at 256–57. However, this does not, as Plaintiffs say, "dramatically alter" the standard of review. (Pls. Obj. 8.) Rather, an insurer must merely show that its interpretation of an exclusion was not arbitrary and capricious. *See Martin v. Hartford Life & Acc. Ins. Co.*, 478 F. App'x 695, 697 (2d Cir. 2012) (noting that on arbitrary and capricious review courts must defer to an insurer's "permissible reading" of a "policy exclusion," even where it conflicts with a court's established "approach"); *Ramsteck v. Aetna Life Ins. Co.*, No. 08-CV-0012, 2009 WL 796999, at *9 (E.D.N.Y. June 24, 2009) ("An insurer may satisfy its burden under the arbitrary and capricious standard by demonstrating that it gave a plan exclusion a reasonable interpretation." (citing *Pagan*, 52 F.3d at 442)).

seeking *de novo* review in spite of such regulatory violations "bears the burden of proof on this issue since the party claiming deferential review should prove the predicate that justifies it.'" *Halo*, 819 F.3d. at 57–58 (quoting *Sharkey v. Ultramar Energy Ltd.*, 70 F.3d 226, 230 (2d Cir. 1995)).

First, Plaintiffs contend that Defendant "did not reference the definition of 'medically necessary' contained in the [Aetna SPD] and, in fact, did not even have possession of such document," in violation of 29 C.F.R. § 2560.503-1(g)(1)(ii). (Pls. Mem. 9–10.) Section 2560.503-1(g)(1)(ii) requires that "a plan administrator . . . provide a claimant with written . . . notification of any adverse benefit determination," which must "set forth, in a manner calculated to be understood by the claimant . . . [r]eference to the specific plan provisions on which the determination is based." 29 C.F.R. § 2560.503-1(g)(1)(ii). Defendant argues that because the Aetna SPD was "not the operative plan document at the time in question," Defendant did not violate any procedural regulations by "not possess[ing] . . . or referenc[ing] its terms." (Def. Opp'n 4.) The Court agrees. Defendant was not required to cite to the Aetna SPD because Defendant did not make its coverage determinations based on the provisions in the Aetna SPD. Defendant did, however, cite to the plan provisions it was relying on in denying C.H.'s claims.[14]

---

[14] For example, in a representative initial denial letter dated October 13, 2013, Dr. Lee H. Becker wrote that:

> [t]he rationale for my decision is based on a review of the behavioral health services you were receiving and response to these services, review of your Summary Plan Description, review of UBH Coverage Determination Guideline for Major Depressive Disorder and Dysthymic Disorder, and review of facility medical records . . . . I have determined that the services you were receiving were not consistent with generally accepted standards of medical practice for the noted symptoms at this level of care and were considered inappropriate/inconsistent per the above UBH Coverage Determination Guideline . . . . As it appeared treatment could have occurred in a less intensive setting, continued treatment in a mental

Second, Plaintiffs contend that Defendant "failed to take account of . . . medical records [and letters from providers] submitted by Plaintiffs," which demonstrated C.H.'s high risk of suicide, self-harm, and non-compliance with treatment, in violation of 29 C.F.R. § 2560.503-1(h)(2)(iv). (Pls. Mem. 10.) Section 2560.503-1(h)(2)(iv) provides that a plan must "[p]rovide for a review [of adverse benefit determinations] that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." 29 C.F.R. § 2560.503-1(h)(2)(iv). Defendant argues that Plaintiffs have "present[ed] no evidence" that Defendant ignored Plaintiffs' submissions, "apart from the fact that [Defendant] . . . ultimately denied their claim." (Def. Opp'n 4–5.)

Plaintiffs' conclusory statement that Defendant did not take account of the records submitted by Plaintiffs on appeal is not sufficient to demonstrate that Defendant violated section 2560.503-1(h)(2)(iv). Defendant reviewed medical records, the letters requesting an appeal, and care management records before issuing its denials of Plaintiffs' appeals. (*See, e.g.*, Appeal Denial Letter dated Feb. 15, 2013 Bates-stamped HAL 189–191, annexed to Halberg Decl. as Ex. 5, Docket Entry No. 30-5.) Based on its review of those records, Defendant determined that C.H.'s symptoms were not consistent with coverage for this level of care. (*Id.*) Defendant noted that "[t]his determination [did] not mean that [C.H.] did not require additional health care, or that [she] needed to be discharged," but merely that coverage was not available under her plan. (*Id.*

---

health PHP appeared inappropriate/ inconsistent [sic] per the above UBH Coverage Determination Guideline. Per your Summary Plan Description, inappropriate/ inconsistent [sic] services are excluded. Benefit coverage would have been available for outpatient mental health services.

(Initial Denial Letter dated Oct. 13, 2013 Bates-stamped HAL 22–23, annexed to Strait Decl. as Ex. A, Docket Entry No. 38-4.)

at HAL 191.)  While Plaintiffs may reasonably believe that C.H.'s treating physicians' observations demonstrated that she needed residential care, "ERISA does not require that an administrator defer or give special weight to a plaintiff's conclusions or those of his treating physicians; rather, the administrator need only give the plaintiff's submissions fair consideration." *Capretta v. Prudential Ins. Co. of Am.*, 16-CV-1929, 2017 WL 4012058, at *4 (S.D.N.Y. Aug. 28, 2017) (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)).  "Where an administrator has afforded such consideration to a claimant's submissions, the fact that it does not agree with their conclusions does not deny the claimant a full and fair review." *Id.* (citing *Demirovic v. Bld'g Serv. 32BJ Pension Fund*, 467 F.3d 208, 212 (2d Cir. 2006)).  Because Plaintiffs do not point to any evidence that Defendant actually failed to consider C.H.'s medical records or the submissions from her treating physicians, they have not shown that Defendant violated section 2560.503-1(h)(2)(iv).[15]

In opposing Defendant's summary judgment motion, Plaintiffs also argue that Defendant has further violated ERISA procedures by presenting "new and previously-undisclosed rationales for denying coverage."  (Pls. Opp'n 7.)  Plaintiffs argue that Defendant, in its summary judgment motion, "posited an entirely new rationale for why [Defendant] denied coverage for C.H.'s care" — "that the [3East Program] supposedly offered 'luxury services' and was a 'non-traditional' residential program" — in violation of ERISA's "full and fair review requirements."  (Pls. Obj. 9.)  Defendant contends that its arguments on summary judgment have been consistent with and

---

[15]  In their summary judgment motion, Plaintiffs also argue that Defendant "issued appeal responses that merely restated earlier findings, often repeating the same language verbatim," in violation of 29 C.F.R. § 2560.503-1(h)(3)(ii) and "failed to disclose the identity of the 'expert reviewer' who conducted an external review of C.H.'s claims," in violation of 29 C.F.R. § 2560.503-1(h)(3)(iv).  (Pls. Mem. 10.)  As stated above, the Court adopts Judge Bulsara's unopposed findings in the R&R that Plaintiffs have not shown that Defendant violated either of these regulations.

based on the same facts as its denials during the administrative process.  (Def. Reply in Supp. of Def. Mot. ("Def. Reply") 11, Docket Entry No. 42-5.)

While the Court agrees that Defendant has gone out of its way to characterize C.H.'s treatment at the 3East Program as providing certain services that went "far beyond what would be considered normal for a mental health institution," (Def. Mem. 12), Defendant's argument on summary judgment is consistent with its administrative denials of coverage for C.H.'s treatment: C.H.'s condition had improved significantly, and she did not require twenty-four-hour residential care, (*id.* at 13–14).

The Court finds no genuine issue of material fact as to whether Defendant violated any ERISA regulations.  Accordingly, the Court reviews Defendant's coverage determinations under the arbitrary and capricious standard of review.

### iii.   Defendant's decision was not arbitrary or capricious

Defendant argues that, under the arbitrary and capricious standard of review, its "conclusion that C.H.'s year-and-a-half stay at the 3East program was not medically necessary, and therefore not covered by the Plan, was a reasonable interpretation of the Plan terms and the evidence and information in the administrative record."  (Def. Mem. 11.)

Plaintiffs argue that, even under the more deferential standard, the Court must set aside Defendant's denials in light of the "extensive evidence" of C.H.'s serious treatment needs.  (Pls. Mem. 10.)

The arbitrary and capricious standard is a "highly deferential level of review."  *Preville v. PepsiCo Hourly Emps Ret. Plan*, 649 F. App'x 63, 64 (2d Cir. 2016); *see also Halo*, 819 F.3d at 56 (noting the "great deference afforded by the arbitrary and capricious standard").  "In the ERISA context, an administrator's decision is arbitrary and capricious if it is made 'without

reason,'" or "is 'unsupported by substantial evidence.'" *Arnone v. Aetna Life Ins. Co.*, 860 F.3d 97, 105 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 557 (2017) (quoting *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 132 (2d Cir. 2008)); *see also Preville*, 649 F. App'x at 64 (a court applying the arbitrary and capricious standard of review "may overturn an administrator's decision to deny ERISA benefits only if it was without reason, unsupported by substantial evidence or erroneous as a matter of law" (quoting *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 83 (2d Cir. 2009))). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator and requires more than a scintilla but less than a preponderance." *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 141 (2010) (quoting *Celardo v. GNY Auto. Dealers Health & Welfare Tr.*, 318 F.3d 142, 146 (2d Cir. 2003)).

"This scope of review is narrow," and courts "are not free to substitute [their] own judgment for that of [the administrator] as if [they] were considering the issue of eligibility anew." *Hobson*, 574 F.3d at 83–84 (quoting *Pagan*, 52 F.3d at 442). Even where "some . . . evidence . . . conflicts with [the administrator's] ultimate conclusion, if the administrator has cited substantial evidence in support of its conclusion, the mere fact of conflicting evidence does not render the administrator's conclusion arbitrary and capricious." *Elizabeth W. v. Empire HealthChoice Assurance, Inc.*, 709 F. App'x 724, 727 (2d Cir. 2017) (internal quotation marks omitted) (quoting *Roganti v. Metro. Life Ins. Co.*, 786 F.3d 201, 212 (2d Cir. 2015).

Under this deferential standard, "[w]here both the plan administrator and a spurned claimant offer rational, though conflicting, interpretations of plan provisions, the administrator's interpretation must be allowed to control." *McCauley*, 551 F.3d at 132 (quoting *Pulvers v. First Unum Life Ins. Co.*, 210 F.3d 89, 92–93 (2d Cir. 2000)). "Nevertheless, where the administrator

imposes a standard not required by the plan's provisions, or interprets the plan in a manner inconsistent with its plain words, its actions may well be found to be arbitrary and capricious." *Id.*

Defendant argues that "evidence in the record shows that [Defendant] and the [external reviewer] reasonably concluded that by early 2012, C.H.'s immediate crisis had passed, and she did not need the sort of [twenty-four]-hour custodial care offered by [the] 3East [Program]." (Def. Mem. 13.)  In support, Defendant points to evidence in the record demonstrating that "by January 15, 2012, C.H. had improved significantly since she had arrived at McClean and since her episode in September 2011," and that "[b]y February 12, 2012, her psychiatric records indicate that she was engaged, with good eye contact, appeared cheerful, was goal[-]oriented with her insight and cognitive skills intact and her judgment was fair." (*Id.*)  In addition to evidence of C.H.'s treatment progress, Defendant also points to evidence in the record that, while in the 3East Program, C.H. regularly left the program for work, school, and home visits.[16] (*Id.* at 14.)  Defendants argue this demonstrates that "the physicians at [the] 3East [Program] recognized that she was capable of being alone without risk to herself, and thus implicitly recognized that the [twenty-four]-hour monitoring she received at the 3East [P]rogram was not medically necessary." (*Id.*)

As discussed above, Plaintiffs contend that the Court should review Defendant's denials *de novo*.  Beyond their conclusory statement that Defendant's "determination was clearly erroneous in light of the extensive evidence that C.H. required the structure of residential care . . . to progress in her treatment and avoid additional [suicide] attempts," Plaintiffs do not

---

[16]  While Plaintiffs disagree as to the significance of the evidence in the administrative record Defendant relies on in making these claims, they do not dispute the existence of the evidence itself.  (Pls. 56.1 Resp. ¶¶ 22–25, 27–33, 37–57.)

meaningfully address why, under the more deferential standard of review, Defendant's denials were arbitrary and capricious.  (Pls. Mem. 10.)  Plaintiffs do not cite to any case law to support their position that, under this highly deferential standard of review, the Court should disturb Defendant's determinations.  Plaintiffs' arguments focus on the evidence in the record that could support a different finding, i.e., that C.H. required twenty-four-hour residential care.  But under Second Circuit law, "administrators may exercise their discretion in determining whether a claimant's evidence is sufficient to support [her] claim," and "where the evidence conflicts," a district court conducting arbitrary and capricious review will uphold the administrator's denial "unless the evidence points so decidedly in the claimant's favor that it would be unreasonable to deny the claim on the basis of the evidence cited by the administrator."  *Roganti*, 786 F.3d at 212; *see also Kruk v. Metro. Life Ins. Co.*, 567 F. App'x 17, 20 (2d Cir. 2014) ("[T]he question is not whether the record would have permitted [the defendant] . . . to find otherwise, but whether the record compelled the different conclusion urged by [the plaintiffs].").

Plaintiffs contend that Defendant's initial denials of coverage "were obviously contradicted by C.H.'s medical records, reflecting the many times she had threatened suicide, engaged in cutting and self-harm, run away from the facility, been readmitted to inpatient hospitalization, and refused medication or treatment."  (Pls. Mem. 5.)  Plaintiffs further argue that Defendant's conclusions in its appeal denials are "impossible to square" with the medical records and letters from C.H.'s treating psychologists Plaintiffs submitted for review, describing C.H.'s "persistent suicidality, self-harm, and struggles with complying with treatment."  (*Id.* at 5.)

In its denials, Defendant stated the factual bases for denying coverage.  These included, for example, that C.H. was "working well with [her] treatment team on [her] recovery goals by

attending therapy sessions and taking medications"; was "able to manage her day-to-day tasks and seem[ed] to be able to interact more positively with others"; was "able to attend multiple [out-of-facility] activities as well as multiple day passes." (Initial Denial Letter dated May 13, 2013 Bates-stamped HAL 31–32, annexed to Halberg Decl. as Ex. 4, Docket Entry No. 30-4 (denying coverage for treatment between February 4, 2013 and April 16, 2013).)[17]

Based on these findings, Defendant's reviewers found that C.H. did "not appear to have significant mood symptoms requiring [twenty-four]-hour monitoring and nursing care"; that, "[a]s it appear[ed] treatment could occur in a less intensive setting, treatment in a mental health residential program appears inappropriate/inconsistent per the [UBH Coverage Determination Guideline for Major Depressive Disorder and Dysthymic Disorder]"; and that, "per [the] . . . Summary Plan Description . . . inappropriate/inconsistent services are excluded." (*Id.* at HAL 32.) However, "[b]enefit coverage would be available for mental health intensive outpatient level of care." (*Id.*)

These findings are supported by substantial evidence. (*See* Def. 56.1 ¶¶ 22–25, 27–33, 37–57 (summarizing medical records documenting C.H.'s progress, including that she presented as cheerful and goal-oriented and was planning for the future; that she was responsive to her medication; that she socialized and engaged well with others; that she left the facility on day

---

[17] (*See also* Appeal Denial Letter dated Aug. 16, 2013 Bates-stamped HAL 211, annexed to Halberg Decl. as Ex. 5, Docket Entry No. 30-5 (affirming denial for same period) ("[Y]ou were able to work with your treatment team on your recovery goals. You did not appear to have significant mood symptoms or thought disturbance requiring [twenty-four]-hour monitoring and nursing care. You were able to work, attend multiple activities and passes. You were able to manage your daily activities and make decisions about treatment. It appears that you had achieved maximum benefit from the residential setting and that you no longer required continued [twenty-four]-hour monitoring and treatment.").)

passes; and that she was able to work and go to school).)[18] That MCMC, an independent and external reviewer, upheld Defendant's decision further demonstrates that Defendant acted reasonably. *See S.M.*, 644 F. App'x at 84 (finding that external reviewer's agreement with defendant's denial of coverage "further confirmed" its "reasonableness").

Plaintiffs make several other arguments, none of which supports a contrary ruling. First, Plaintiffs argue that Defendant's "findings . . . contradicted [Defendant's] own Level of Care Guidelines for Residential Care." (Pls. Mem. 6.) In support of this argument, Plaintiffs point to language in Defendant's guideline stating that "[r]esidential services are delivered . . . to members who do not require [twenty-four]-hour nursing care and monitoring offered in an acute inpatient setting but who do require [twenty-four]-hour structure." (*Id.*) Plaintiffs argue that Defendant's finding that "residential care was not warranted for C.H. because she did not appear to require '[twenty-four]-hour monitoring and nursing care'" cannot be reconciled with the guideline's specification that "residential care was *only* appropriate for patients *not* requiring [twenty-four]-hour monitoring or nursing care." (*Id.* (emphasis added).) In other words, because C.H. did *not* need twenty-four-hour monitoring, she therefore *did* meet the required condition for residential care.

While it is not evident that failure to strictly comply with this guideline would be arbitrary or capricious, Plaintiffs have not actually demonstrated that Defendant failed to comply with the guideline. Plaintiffs focus on the "[twenty-four]-hour monitoring and nursing care" language, but the guideline indicates a number of additional criteria that must be met for a member's residential care to qualify for coverage, beyond simply not requiring "[twenty-four]-

---

[18] Plaintiffs do not dispute the content of these medical records. (Pls. 56.1 Resp. ¶¶ 22–25, 27–33, 37–57.)

hour monitoring and nursing care," even beyond the "[twenty-four]-hour structure" requirement

that Plaintiffs similarly do not address. (*See* 2011 Level of Care Guidelines, Mental Health

Conditions: Residential Treatment Center Bates-stamped HAL 555–57, annexed to Halberg

Decl. as Ex. 1, Docket Entry No. 29-4.) In other words, the mere fact that someone does not

require twenty-four-hour monitoring does not in and of itself qualify them for residential care.

Furthermore, the Court agrees with Defendant that it is evident in context that the statement that

C.H. did not require "[twenty-four]-hour monitoring and nursing care" indicated the reviewer's

conclusion that "C.H. did not need [twenty-four-]hour care." (Def. Opp'n 11.)

     Second, Plaintiffs argue that the rationale Defendant relied on in denying C.H.'s coverage

was "[p]retextual," because "the record now reveals that [Defendant] considers [the] 3East

[Program] a 'self-pay program' that is never eligible for insurance reimbursement," and

Defendant "would have denied coverage regardless of whether the treatment provided to C.H. . .

. was medically necessary." (Pls. Mem. 8–9.) As an initial matter, the Court notes that this

argument is undermined by the fact that Defendant did approve coverage of C.H.'s stay at the

3East Program from December 27, 2011 through January 14, 2012. (Def. 56.1 ¶ 55; Pls. 56.1

Resp. ¶ 55.) Furthermore, if true, Plaintiffs have failed to explain the relevance of this fact to

arbitrary and capricious review.

     Third, Plaintiffs argue that Defendant failed to comply with the definition of "Medically

Necessary" set forth in the Aetna SPD. (Pls. Mem. 7.) Because the Court finds that Defendant

was not bound by the Aetna SPD, Defendant was not required to comply with the Aetna SPD's

definition of "Medically Necessary."

     The Court is sympathetic to Plaintiffs' arguments that, given C.H.'s documented

struggles with depression and self-harm, Defendant's "reviewers, from a distance and without

ever having examined C.H.," should have concluded that C.H.'s treatment was medically necessary. (*See* Pls. Rep. 8.) However, Plaintiffs have not demonstrated that under the applicable deferential standard, Defendant's denials were unsupported by "evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator." *Durakovic*, 609 F.3d at 141 (citation omitted).

Accordingly, the Court finds that Defendant's administrative denial of coverage for C.H.'s treatment in the 3East Program was not arbitrary or capricious, and grants Defendant's summary judgment motion as to as Plaintiffs' section 502(a)(1)(B) claim.

### d.  Plaintiffs' full and fair review claim

Plaintiffs also allege that Defendant violated sections 502(a)(3) and 503(2) of ERISA. (*See* Compl. ¶¶ 28–35.) In their summary judgment motion, Plaintiffs argue that the same regulatory violations that require the Court to review Defendant's denial *de novo* "entitle Plaintiffs to an order of judgment against [Defendant] for violation of [s]ections 502(a)(3) and 503." (Pls. Mem. 10.) For the reasons stated above, the Court finds that there is no genuine issue of material fact as to whether Defendant committed the alleged ERISA regulatory violations. The Court therefore grants Defendant's motion for summary judgment as to Plaintiffs' claim under sections 502(a)(3) and 503(2).

### e.  Motion to stay

Because the Court grants Defendant's motion for summary judgment, the Court denies as moot Defendant's motion to stay the action pending resolution of the *Wit* class action.

### III.  Conclusion

For the foregoing reasons, the Court grants Defendant's motion for summary judgment and denies Plaintiffs' motion for summary judgment.  The Court denies Defendant's motion to stay.  The Clerk of Court is directed to close this case.

Dated:  September 30, 2019
       Brooklyn, New York

SO ORDERED:


_____s/ MKB_____
MARGO K. BRODIE
United States District Judge